IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHAMES-YEAKEL, et. al., | ) |
| Plaintiffs, | ) |
| v. | ) Case No.: 07-5387 |
| CITIZENS FINANCIAL BANK, | ) Judge: Pallmeyer |
| Defendant. | ) |

## **CITIZENS' STATEMENT OF FACTS PURSUANT TO LR 56.1**

### **The Plaintiffs**

1.  Plaintiff Marsha Shames-Yeakel is a sophisticated business owner. She is an accountant trained as a CPA and runs a company known as Best Practices. *Deposition of Marsha Shames-Yeakel* ("*Marsha Dep.*"), Ex. 1, 5:18-21, 6:4-5, 8-9[1]. Best Practices provides complex services to other businesses, including accounting and bookkeeping services. *Id.* 5:20-21. Best Practices also serves as the controller for other companies overseeing those companies' books, doing monthly and compliance reporting, and preparing books for accountant review. *Id.* 6:4-5, 12-15.

2.  Best Practices's offices are located in the Plaintiffs' home. *Id.* 8:6-7. The company incurs the ordinary expenses of a business of its sort, including expenses for the car used for business purposes, computer expenses, Internet access and cell phone service. *Id.*, 8:13-16.

---

[1] **Explanation of citations to the record.** Citizens' citations to the testimony and records establishing these matters as undisputed facts are in the following form: a brief description of the testimony or record (e.g., "Marsha Shames-Yeakel Dep."), a citation to the exhibit number where the testimony or record is organized in Citizens' appendix of supporting materials ("Ex. 1") and, where applicable, a citation to the relevant page, line (or paragraph) numbers, or attachment within the testimony or record. Additionally, Citizens has cited pleadings. References to these materials are to their respective docket numbers (e.g., Dkt. 7, ¶42, is a reference to a matter in paragraph 42 of the Plaintiffs' Amended Complaint).

3. The only banking accounts the company has ever had are the current business checking account the company has and the business checking account that is the subject of this lawsuit. *Id.* 8:23-24, 9:6-9.

4. Michael Shames-Yeakel also works under the Best Practices company name, doing project management and computer programming. *Deposition of Michael Shames-Yeakel* ("*Michael Dep.*"), Ex. 2, 6:8-10, 5:14-16. He does most of his work from Best Practices's office location in the home he shares with Ms. Shames-Yeakel. *Id.* 7:4-6, 30:21-23. But the job requires some travel, and for that he has a car that he uses for business purposes. *Id.*, 29:15-16, 22-24, 30:1, 31:2-6.

## Defendant Citizens Financial Bank

5. Founded in the time of the Great Depression, Citizens Financial Bank is a federally insured savings bank with branch locations in Northwest Indiana and the Chicagoland area. *Declaration of Jeffrey Stur* ("*Stur Decl.*"), Ex. 3, ¶ 2. Over the years the bank has expanded its services to serve businesses of all sizes, offering services such as business checking and commercial loans. *Id.* The Plaintiffs were longtime customers of the bank. *Marsha Dep.*, Ex. 1, 26:3-6.

## Plaintiffs' Accounts With Citizens

6. In April 2003, the parties entered into an agreement whereby Citizens extended a $50,000 line of credit to Plaintiffs. *Stur Decl.*, Ex. 3, Attachment 3; *Marsha Dep.*, Ex. 1, 27:15. The line of credit agreement contains an Indiana choice of law provision. *Stur Decl.*, Ex. 3, Attachment 3, p. 4.

7. Ms. Shames-Yeakel testified about four advances that the Plaintiffs ordered on the line of credit. The first was for "investment" purposes, to buy real estate in Chicago. *Marsha Dep.*, Ex. 1, 28:4-6. The second was for an automobile which Ms. Shames-Yeakel used for

6367094v1 0882906 63070

business purposes. *Id.*, 28:10-12. The third was for a new roof on the house (which is also the location of Best Practices's offices). *Id.*, 28:13-14, 8:6-7. The fourth advance – arguably the only one for purely personal reasons – was for a car for their daughter. *Id.* 28:6-7.

8. Mr. Shames-Yeakel testified that one of these advances was also used to buy a car for him, which he drove for business purposes. *Michael Dep.*, Ex. 2, 29:22-24, 30:1, 31:2-6.

9. Defendant Citizens Financial Bank also provided business checking services to Best Practices. *Marsha Dep.*, Ex. 1, 26:15-17. In June 2006, both plaintiffs – as authorized signatories of the Best Practices business checking account, executed an "Online Commercial Account Authorization for Linking and Access." *Id.* The effect of this authorization was to link two accounts – the Best Practices business checking account and the Plaintiffs' line of credit. *Id.* Among other things, this linking permitted Best Practices to more easily make transactions between the business checking account and the line of credit. *Id.*; *Marsha Dep.*, Ex. 1, 29:1-9.

**Business Online Banking**

10. Citizens provides the ability for its customers to access their accounts through the Internet. *Declaration of Rebecca Rees ("Rees Decl.")*, Ex. 4, ¶ 2; *Stur Decl.*, Ex. 3, ¶ 3. This service – which was available to and used by Plaintiffs – permits Citizens customers to do a number of things, like view account balances, review transaction history, and transfer funds between and out of accounts. *Stur Decl.*, Ex. 3, ¶ 3; *Marsha Dep.* 28:20-22.

11. At Plaintiffs' request, Best Practices's business checking account was "linked" with Plaintiffs' line of credit, so Plaintiffs could transfer funds between those accounts. *Marsha Dep*. 31:9-12. And plaintiffs frequently did that. The majority of the online transfers of funds out of the business checking account for 2006 and 2007 were to make payment on the line of credit. *Stur Decl.* Ex. 3, ¶ 7.

12. To be enrolled in business online banking, Plaintiffs had to submit a "Business Online Banking Application." *Id.*, ¶ 4. Language on this application references the terms of the Internet Banking Agreement discussed more fully in ¶ 16 below. *Id.*, Attachment 1. To log on to Citizens' business online banking system, Plaintiffs were required to enter a username and password. *Marsha Dep*. 33:8-13; *Declaration of Carol Romes* ("*Romes Decl*."), Ex. 5, ¶3. The passwords used by Plaintiffs were chosen by them, and not known by Citizens. *Marsha Dep.*, Ex. 1, 33:13; *Romes Decl.*, Ex. 5, ¶3; *Deposition of Debora Milne* ("*Milne Dep*."), Ex. 6, 37:24.

13. Both Mr. and Ms. Shames-Yeakel accessed their accounts using a connection to the Internet provided by Comcast. *Marsha Dep*., Ex. 1, 21:10-19.

14. Citizens contracts with a third party entity known as Fiserv to provide business online banking services to Citizens' customers. *Romes Decl.*, Ex. 5, ¶2. A critical component of the work that Fiserv does is to provide information security services, so that the important banking information – such as the login credentials supplied by the user and the actual account information – is kept private as it is transferred over the Internet. *Id.* Fiserv is highly regarded in the banking industry, and has a reputation for providing quality services of this type. *Id.*

15. Citizens also undertakes certain security measures of its own. It issues passwords to its business online banking customers, and those passwords must be changed by the customer before business online banking can be used. *Romes Decl.*, Ex. 5, ¶3. The bank has also implemented procedures to accomplish the separation of duties of various bank personnel to ensure that access to systems is granted only to those with a business need for such access. *Id*.

16. By using Citizens' business online banking services to access their accounts, the Plaintiffs agreed to be bound by the terms and conditions of the "Citizens Business Online Banking / Internet Banking Agreement." *Stur Decl.* Ex. 3, ¶ 5. This agreement provides, among

other things, that "by using Citizens Business Online Banking services . . . [the Plaintiffs] have agreed to the terms and conditions of [the] Agreement and that no signature by [the Plaintiffs] is required on [the] Agreement." *Id*., Attachment 2, p.1.

17. The Agreement further provides that the Plaintiffs "acknowledge and agree that [the] Agreement sets forth security procedures for electronic banking transactions that are commercially reasonable." *Id*., Attachment 2, p. 8.

18. The Plaintiffs also agreed that Citizens "will have no liability to [the Plaintiffs] for any unauthorized payment or transfer including wire transfer made using [the Plaintiffs'] password that occurs before [Plaintiffs] have notified [Citizens] of possible unauthorized use and [Citizens has] had a reasonable opportunity to act on that notice." *Id.*

19. Citizens has retained an information security expert who states that "[a]fter reviewing the security controls implemented by Fiserv and [Citizens], I believe that they were reasonable and not the cause of the unauthorized transfer." *Defendant's Disclosures Pursuant to Fed. R. Civ. P. 26(a)(2)*, Ex. 8, *Report of Mark P. Scholl.*

**The Alleged Unauthorized Transfers**

20. On February 13, 2007, someone used a Comcast Internet account to log onto Citizens' business online banking system using Ms. Shames-Yeakel's username and password. *Rees Decl.*, Ex. 4, ¶4-5; *Milne Dep.*, Ex. 6, 75:5-6.

21. During that business online banking session, this person ordered and advance of $26,500 on Plaintiffs' line of credit, and had that amount placed into Best Practices's business checking account. Dkt. 7, ¶ 9. From the Best Practices checking account, the funds were wired to a bank in Hawaii. *Id.* From Hawaii, it is believed the funds were transferred to a bank in Austria. *Milne Dep.*, Ex. 6, 39:9-17.

5

### Citizens' Comprehensive Investigation

22. Ten days after the $26,500 was transferred between and out of Plaintiffs' accounts, Marsha Shames-Yeakel called Citizens to report that funds had been transferred. This first call came into the bank near the end of the day, close to 5:00 p.m. on Friday, February 23, 2007. *Milne Dep.*, Ex. 6, 23:18-20.

23. A Citizens employee answered the phone, and immediately escalated the situation to the Vice President of the bank's Business Resource Center, Deborah Milne. *Id.* 18:11-17. Citizens immediately began a thorough investigation that lasted several weeks.

24. During that initial call and into the following weeks, Ms. Milne worked with Ms. Shames-Yeakel to figure out what may have happened to the money. Ms. Milne asked several questions of Ms. Shames-Yeakel, inquiring on topics such as the safeguarding of Ms. Shames-Yeakels's username and password (*Id.* 19:15-16), whether that login information could have been compromised (*Id.* 21:2-4), and information about the connection Plaintiffs used to access the Internet Ms. Shames-Yeakel used (the IP address) (*Id.* 21:13-15). During the initial call Ms. Milne looked up information in an "e-Corp" report which confirmed Ms. Shames-Yeakel's username and password had been used to make the transfers in question. *Id.* 25:2-10.

25. The following Monday, Ms. Milne communicated with Ms. Shames-Yeakel again *Id.* 38:5-7. Ms. Milne also took immediate steps to try and get the money back. She communicated with staff of the bank's "wire room," seeking to "recall" the $26,500 which had been wired from the Best Practices business banking account to American Savings Bank in Hawaii. *Id.* 38:11-12. Though Citizens requested to have the money returned, it was not. *Id.* 39:3-8. The money had already been transferred out of the bank account in Hawaii into an account in Austria, and the Austrian bank would not return the money to Hawaii. *Id.* 39:10-17.

26. Ms. Milne also personally contacted staff at the American Savings Bank in Hawaii on that Monday (*Id.* 39:22-24, 40:1) and on several occasions thereafter. *Id.* 46:20-21. She contacted the bank in Hawaii to explain the situation, and to follow up on whether the money would be returned *Id.*, 46:20-24, 47:1-11. Ms. Milne continued to be "very involved in trying to get [the Plaintiffs'] money back." *Id.* 45:19-20. She worked with Ms. Shame-Yeakel to have her submit to the bank a dispute form. *Id.* 47:17-18. She asked Ms. Shames-Yeakel to provide a police report on the incident to the bank, and when Ms. Shames-Yeakel did not do so, Ms. Milne picked such report from the police station on her own. *Id.* 47:20-22.

27. In addition to these communications with Ms. Shames-Yeakel and the bank in Hawaii, Ms. Milne also worked with Fiserv to attempt "shed light" as to the location of the computer used to make the disputed transfers. *Id.* 47:23-34, 48:1-2. She communicated with the bank's attorney and in house information technology professionals to see whether there was anything more that could be done, "since the avenue of recalling the wire was dead." *Id.* 48:5-9.

28. Citizens worked diligently through normal banking channels to recover Plaintiffs' funds. Indeed, Ms. Milne went above the call of duty in following up on the funds that had been wired to the bank in Hawaii. The investigation had revealed the funds were transferred to an account in Hawaii held by one JV Financial. *Id.* 76:2-3.

29. While waiting for word from the bank in Hawaii as to whether the funds would be returned, Ms. Milne did extra investigative work by going to the Hawaii Secretary of State's website to investigate JV Financial. *Id.* 76:11-12. She then looked up the business in a white pages directory and made a phone call "trying to contact them directly to get the money back." *Id.* 76:13-22. Unable to reach a person directly, she left a voice mail message, but unfortunately did not hear back. *Id.* 77:1-5.

30. Ms. Milne collaborated with others within the bank to set forth Citizens' decision in a letter to the Plaintiffs that it would not absorb the disputed amount. *Id.* 67:18-20.

31. Ms. Milne was not the only one within Citizens that conducted an investigation into what may have happened with Best Practices's money. Other high-level Citizens employees spent considerable amounts of time and effort trying to solve the mystery and to recover the funds.

32. Rebecca Rees (Senior Vice President of Information Systems and Operations) investigated the events surrounding the disputed transfers and compiled a document titled "Internet Access Recap Report." *Rees Decl.*, Ex. 4, Attachment 1. To compile this report, Ms. Rees consulted with a number of sources, including logs provided by Fiserv and data kept by Citizens. *Id.*, ¶4. She matched up activity for the Plaintiffs' accounts which led her to conclude that the disputed transactions were made using a computer connected to the Internet through a Comcast account. *Id.*, ¶5.

33. Citizens' retained expert concludes that the investigation "was reasonable and conducted properly." *Defendant's Disclosures Pursuant to Fed. R. Civ. P. 26(a)(2)*, Ex. 8, *Report of Tim Tedrick*.

## The Plaintiffs' Default on Their Line of Credit

34. The Plaintiffs disputed that they had to pay back the $26,500 and interest, and Citizens determined the Plaintiffs to be in default on their line of credit. *Deposition of Jeffrey Stur* ("*Stur Dep.*"), Ex. 7, 90:22-23.

35. After the Plaintiffs defaulted on their line of credit, Citizens reported the delinquencies to the major credit reporting agencies, and the Plaintiffs disputed the information which Citizens had provided. Dkt. 7, ¶29.

36. Citizens reviewed its records to see that the line of credit account was delinquent, and concluded that the Plaintiffs were responsible for absorbing the purported loss of $26,500. *Stur Dep.*, Ex. 7, 76:16-24, 82:12-17, 89:12-16.

37. Citizens looked to the comprehensive investigation into the entire dispute lodged by the Plaintiffs, examining data logs and other technical information, reviewing the unauthorized transfers, contacting other banks, following up with correspondence, doing independent research on the Internet to try and figure out where the funds might have gone, calling phone numbers in hopes of tracking down the funds, and making special trips to the local police department. *Milne Dep.*, Ex. 6, *passim*; *Rees Decl.*, Ex. 4, ¶4-6.

38. Citizens undertook a thorough and comprehensive investigation into the Plaintiffs' dispute concerning credit reporting, responding to each dispute initiated by the Plaintiffs. *Stur Dep.*, Ex. 7, 71:17-20, 74:17-20.

39. Citizens employees handled the credit disputes properly and according to the bank's policies and procedures. *Id.*, 82:18-23. In fact, the bank did more than its normal practice to address the Plaintiffs' concerns about the dispute over the past-due amount. It wrote two letters to the Plaintiffs on the issue. *Id.*, 84:16 – 85:22.

40. Based on the investigation into not only the Plaintiffs' credit dispute, but also the investigation as a whole, Citizens concluded that the amount of the disputed transfer from the line of credit, plus interest, was due. *Id.*, 89:6-16.

**Report From the Office of Thrift Supervision**

41. Subsequent to the disputed transfer, the Office of Thrift Supervision – the agency within the Department of the Treasury that is responsible for regulation and enforcement concerning federally insured savings banks such as Citizens – reviewed the matter. On July 27,

2007 the agency issued a letter to the Plaintiffs regarding its findings. *Stur Decl.*, Ex. 3, ¶ 9, Attachment 5.

42. In the letter, the OTS explains its conclusions that neither regulations under the Truth in Lending Act (Regulation Z) nor the Electronic Funds Transfer Act (Regulation E) apply to the situation. *Id.* Of particular note is the OTS's conclusion regarding the effect of linking the home equity line of credit and the business banking account: After the Plaintiffs "signed an agreement with [Citizens] linking all of [their] accounts with [Best Practices's] business checking account . . . the home equity line of credit was used as a business purpose account, as opposed to being for personal, family or household purposes." *Id.*

43. The OTS continued by stating that "[f]or this reason, Regulation Z does not apply to your situation." *Id.* The OTS similarly concluded that Regulation E did not apply, as the home equity line of credit was not an asset account covered under the regulation, and the regulation does not govern business checking accounts. *Id.*

                              CITIZENS FINANCIAL BANK

                              By: s/Evan D. Brown
                                    Evan D. Brown

Timothy A. Hickey
Evan D. Brown
Hinshaw & Culbertson LLP
222 N. LaSalle, Suite 300
Chicago, IL 60601
312-704-3000

6367094v1 0882906 63070

## **CERTIFICATE OF SERVICE**

I certify that pursuant to Local Rule 5.5, service of the foregoing CITIZENS' STATEMENT OF FACTS PURSUANT TO LR 56.1 was accomplished upon all Filing Users pursuant to the Court's Electronic Case Filing system on September 30, 2008.

/s/ Evan D. Brown