COPY

STATE OF ILLINOIS )
) SS.
COUNTY OF C O O K )

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DISTRICT

MARSHA L. SHAMES-YEAKEL AND )
MICHAEL W. SHAMES-YEAKEL, )
)
Plaintiffs, )
) Civil Case
vs ) No. 07-5387
)
CITIZENS FINANCIAL BANK, )
)
Defendant. )

The discovery deposition of DEBORAH MILNE, called by the Plaintiff, for examination, pursuant to notice, taken before Rebecca A. Graziano, CSR, within and for the County of Cook and State of Illinois, at 205 North Michigan Avenue, 40th Floor, Chicago, Illinois, on the 13th day of May, A.D., 2008, commencing at 2:00 p.m.

A P P E A R A N C E S

FRANCIS & MAILMAN,
100 South Broad Street
19th Floor
Philadelphia, PA 19110
(215) 735-8600
BY: MR. JOHN SOUMILAS

Appeared on behalf of the Plaintiffs,

HINSHAW & CULBERTSON, LLP,
222 North LaSalle Street
Suite 300
Chicago, Illinois 60601
(312) 704-3000
BY: MR. EVAN BROWN

Appeared on behalf of the Defendant.

I N D E X

THE WITNESS: DEBORAH MILNE

PAGE

Examination by Mr. Soumilas.................4

E X H I B I T S

| | Marked for Identification |
|---|---|
| Exhibit No. 1 | 26 |
| Exhibit No. 2 | 49 |
| Exhibit No. 3 | 56 |
| Exhibit No. 4 | 67 |
| Exhibit No. 5 | 68 |
| Exhibit No. 6 | 80 |
| Exhibit No. 7 | 80 |
| Exhibit No. 8 | 85 |
| Exhibit No. 9 | 91 |
| Exhibit No. 10 | 98 |
| Exhibit No. 11 | 105 |

(Witness sworn.)

WHEREUPON:

DEBORAH MILNE

called as a witness herein, having been first duly sworn, deposeth and saith as follows:

E X A M I N A T I O N

BY MR. SOUMILAS:

Q. Good afternoon, Ms. Milne. My name is John Soumilas. We met off the record just a moment ago. I'm an attorney for Michael and Marsha Shames-Yeakel, and I'm here today to take your deposition in a lawsuit that they brought against your employer, Citizens Financial Bank. Did I pronounce your name correctly, ma'am?

A. Milne.

Q. Was that your last name throughout the last couple of years?

A. Yes.

Q. And the reason I'm taking your deposition is because the bank's attorneys, in their initial disclosures, identified you as somebody who may know information related to the claims that my clients brought in this lawsuit. Now have you given testimony under oath before?

A. No, I have not.
Q. All right. No trial, deposition, anything like that?
A. No.
Q. Okay. You took an oath at the beginning of this deposition that would require you to tell the truth, just as if we were in court and in front of a judge and jury today. Do you understand that?
A. I do.
Q. I will ask you a number of questions, and then I would ask you to please give your full answer on the record, okay?
A. Okay.
Q. If there's anything confusing about any of my questions or something that you just don't hear or don't understand, will you please let me know?
A. I will.
Q. If you don't let me know, I'll have to conclude that you heard me, that you understood me, and that you're giving me a truthful response. Do you understand that?
A. Yes.

Q. If you need a break, just let us know and we'll take one.
A. Okay.
Q. Did you speak with anyone, Ms. Milne, in connection with this case?
A. Yes.
Q. Who did you speak with?
A. Team members inside the bank.
Q. Okay. So those are employees of the bank?
A. Yes.
Q. Did you speak with anybody outside of the bank?
A. No.
Q. Did you have any nonspeaking communications, such as emails or letters, with anyone outside of the bank?
A. No.
Q. Who are the team members that you spoke with?
A. Our security person. Do you want, like, their actual names?
Q. Their names, yes.
A. Ken Potchen.

Q. What's the last name?
A. P-o-t-c-h-e-n.
Q. Okay.
A. Rebecca Rees, our senior vice president of information technology.
Q. Okay.
A. Tom Darovic, he's our executive vice president of the bank, and that's who I reported to at the time.
Q. Okay.
A. Our attorney, Ryan Goins.
Q. Okay. And that is an attorney with the Hinshaw firm?
A. Yes.
Q. Okay. But you spoke with him before this lawsuit was initiated?
A. Yes.
Q. About the disputes that the Shames-Yeakels made to the bank?
MR. BROWN: This -- don't answer that. That calls for attorney-client communication.
MR. SOUMILAS: Oh.
MR. BROWN: He's been legal counsel for many years.

MR. SOUMILAS: You're invoking the privilege as to communications between Mr. Goins, or anybody at your firm, and the bank?
MR. BROWN: Precisely.
MR. SOUMILAS: Okay. I just made that clear for the record.
BY MR. SOUMILAS:
Q. Don't tell me what was said with any lawyer, ma'am, but did you speak with any other attorney before this lawsuit?
A. Yes.
Q. Okay. What other attorneys did you speak or communicate with in writing?
A. Vedder Price's office. Her name is Hope Schall.
Q. So that is a different law firm than the Hinshaw law firm?
A. Correct.
Q. Okay.
MR. SOUMILAS: And are you invoking the privilege, Counsel, as to those communications as well?
MR. BROWN: You bet.

BY MR. SOUMILAS:

Q. Okay. And any other attorneys, other than the attorneys that you identified at the Hinshaw firm and at the Vedder Price firm?

A. No.

Q. Okay. Did you speak with anybody else at the bank outside of the presence of counsel?

A. I spoke to the people that I gave you.

Q. Okay. And even after the commencement of this lawsuit by my clients, did you speak with anybody at the bank outside of the presence of attorneys, or is this everybody?

A. The only other person I failed to mention -- and again, this was prior to the lawsuit -- is our CEO, Tom Prisby.

Q. Okay. Anybody else at the bank?

A. Carol Romes, senior vice president, risk and compliance officer.

Q. Okay. Anybody else either before or after this lawsuit was filed?

A. I would say no.

Q. Okay. And you did not speak or communicate with the plaintiffs directly?

MR. BROWN: I'll object to the form of



the question, as lacks foundation.

BY MR. SOUMILAS:

Q. Could you answer that?

MR. SOUMILAS: Do you understand the question?

THE WITNESS: I think he's asking me if I had any direct communication with the Yeakels.

BY MR. SOUMILAS:

Q. Yes, that's what I'm asking you.

A. Well, yes.

Q. Yes. Okay. Because I thought I had asked you whether outside of the bank team you had communications with anybody else about this case, and I thought you told me no.

A. I did say no.

Q. Okay. But you did have communications with the Yeakels?

A. Well, of course, yes.

Q. All right. Now --

MR. BROWN: Your question was about this case.

BY MR. SOUMILAS:



Q. And it still is. It's about this case, correct?

A. Mm-hmm.

Q. You didn't -- is that a yes, ma'am?

A. Yes.

Q. You didn't have communication with the Yeakels about going out to lunch or some other activities about the disputes in this case?

A. We had communication about how we were looking to help her recover her funds.

Q. Okay. Anybody else who's not a bank employee and is not the Yeakels that you had any oral or written communications with about this case?

A. No one else comes to mind.

Q. Okay. Now, did you review any documents for your deposition today, ma'am?

A. Yes.

Q. And what documents did you review?

A. I'm guessing it's going to be those. There was a stack of documents that we were asked to prepare. In other words, any kind of -- anything that we had relative to the case we needed to provide.

Q. Okay. And you did reference a stack



of documents on the table, which I will represent, for the record, were produced by the bank to us in this litigation this past Friday, and they have these Bates numbers, if you will, see them at the bottom?

A. Yes.

Q. These three stacks are Citizens 1 and they run through 195. I will also represent to you that we used some this morning at Mr. Stur's deposition, which we marked separately here on a pile at the side. Okay. My question is: Did you have a chance do review all of the documents 1 through 295 before they were produced to us?

A. Well, I would say that this is probably the stack that I looked at, and I don't know that I've seen these.

Q. Okay. For the sake of the record, there are some documents in the Stur exhibits, which have to do with interrogatories and a deposition notice, and then there are some other documents that are in the sequence of 1 through 295 that I mentioned earlier.

A. Okay.

Q. Is your general understanding that you

reviewed these documents?

MR. BROWN: John, what I would suggest is if you have questions about particular documents, ask her about them. I mean, if you want to take the time to have her go through this whole big stack here, we will take that time.

MR. SOUMILAS: No.

MR. BROWN: I mean, she's not going to tell you whether she's -- she's not going to just look at this and know by osmosis whether she's reviewed them.

MR. SOUMILAS: No, that's not my question.

BY MR. SOUMILAS:

Q. My question is: If we want to get into particular documents, ma'am, I'll show you that particular document and we can talk about it. I want to know whether you think you reviewed the entire production that the bank gave us in this case?

MR. BROWN: I'll object, in as much as that calls for speculation.

THE WITNESS: I reviewed a set of

documents prior to this, and just by looking at the, you know, top few, some are familiar and some are not.

BY MR. SOUMILAS:

Q. Okay. Let me ask it another way.

A. Mm-hmm.

Q. We started this line of questioning by you telling me that you assisted in putting together everything that the bank had about this case. Do you remember that testimony?

A. I remember talking about giving documents, anything that I had. I'm not the only person, though.

Q. Okay. Did you assist in preparing documents to be produced in this litigation?

A. I assisted by giving what I had in my possession.

Q. Okay. And you gave everything over to the lawyers?

A. I gave it to the collection person, Rebecca Rees, who then took all of the others and put them together and handed them to the attorneys.

Q. Have you seen what the attorneys handed to us?

A. I don't know if I've seen it all.

Q. That's a fair answer, if that's your answer. Clearly, you reviewed the documents that you had in your possession, which you turned over to Ms. Rees, correct?

A. Yes.

Q. Okay. Did you review any other documents, other than those documents in your possession, in preparing for this deposition?

A. I would say no.

Q. Okay. Could you tell me how long you've worked for the bank, ma'am?

A. Sure. I have worked for the bank for 20 years.

Q. And what is your present title?

A. Vice president, business resource center.

Q. Where do you work out of, what location?

A. Our Dyer, Indiana, location.

Q. How long have you had the vice president of the business resource center title?

A. Five years.

Q. And what are your basic duties and

responsibilities in that position?

A. I'm responsible for our day-to-day operation of cash management, products and services. I have a group that handles the operational side, and then I also have a small sales team that, again, sells the cash management, which specifically is the deposit products and services for businesses.

Q. Anything else?

A. No.

Q. What is your educational background?

A. I hold a bachelor degree of science from Purdue University, Calumet. I hold --

Q. I'm sorry what's the last thing you said?

A. Purdue University, Calumet.

Q. Is that a location, Calumet?

A. Uh-huh. It's the Calumet campus.

Q. Okay. And what is that in?

A. What is what in? The bachelor of science?

Q. The bachelor of science, yeah.

A. It's a straight bachelor of science. There's an emphasis in supervision and human resource management.

Q. Okay. Any other college level education?
A. No.
Q. Have you ever taken any courses in law?
A. No.
Q. Have you ever taken any courses in computer programming?
A. As part of that bachelor of science there was a couple of classes, very entry level.
Q. When did you get your degree from Purdue?
A. In '93.
Q. Since Purdue, have you taken any computer --
A. No.
Q. -- programming courses?
A. No.
Q. Have you taken any computer related courses or training separate from traditional programming?
A. No.
Q. How did you first become aware of a dispute between the Yeakels and the bank?

A. When Mrs. Yeakel called to report that she had just gotten the mail, and she had opened her statement, and she found a transaction that she believed didn't belong to her, so she called in.
Q. And do you know when that occurred?
A. On the 23rd, I believe, of February of last year.
Q. And is that when this matter first came to your attention, personally?
A. Yes, that day.
Q. Did she speak with you?
A. She called in, a member of my team took the call, found out what she wanted, and then the call was referred to me.
Q. And did you speak with Mrs. Yeakel at that time?
A. Yes.
Q. What did she tell you?
A. She said "I -- this is who I am, and I'm calling to let you know that I just received my bank statement, and I opened it up, and there's a transaction that doesn't belong to me."
Q. In terms of timing, does that seem about right as to when bank statements would've gone

out, a little bit before the 23rd of February?
A. Well, she was referring to her line of credit, and I don't -- I don't have knowledge of when the line of credit statements come out.
Q. Okay. What else did she tell you, if anything?
A. I asked her some questions, and then she answered them.
Q. Okay.
A. Do you want me to tell you what those were?
Q. If you remember, sure.
A. I'll give you what I can remember.
Q. Yes.
A. I asked her how she safeguards her user ID and her password.
Q. Okay.
A. And do you want the answer now?
Q. Sure. That would make sense. What did she say about safeguarding the user ID and password?
A. She said that the user ID is stored on the browser, and the password is kept in her lap drawer.

Q. Okay. So just so that I understand the first part of your answer, does that mean that when you were to go in her computer to access this account, the computer remembers the pass --
A. Yes.
Q. -- the ID and password?
A. Yes.
Q. Okay. And she also had a handwritten copy in a drawer in her office?
A. Of the password?
Q. Of the password.
A. Mm-hmm.
Q. Is that a yes, ma'am?
A. Yes, she had a handwritten -- her password was handwritten and kept in the lap drawer.
MR. SOUMILAS: Okay. Let's go off the record for a second.
(Whereupon, a discussion was had off the record.)
BY MR. SOUMILAS:
Q. Other than your question about safeguards, do you recall any other parts of the conversation?
A. Yes.

Q. What else did you ask?
A. Give me one second. I asked her if she knew how her user ID and password could have been compromised, and she said no.
Q. Okay. Any other part of the conversation that you remember?
A. I remember her volunteering that she said she hardly ever logs in, maybe twice a month, and she said that her husband logs in more than she does.
Q. Okay. Anything else that you remember?
A. I asked her if she could tell me her IP address of the computer that she uses there at home.
Q. Okay. And what did you mean by that?
A. The IP address, I believe, is an address of the computer.
Q. All right. And did she answer that?
A. She did.
Q. Did she give it to you?
A. She did.
Q. Okay. And is that something that you wrote down someplace?

A. Yes.
Q. Okay. Where did you write it down?
A. On a piece of paper that I had in front of me.
Q. Okay. And are you aware whether that IP address that Mrs. Yeakel gave you at the initial call is something that we still have today in some of the records?
A. Yes, it is.
Q. Okay. Do you know whether that information made its way into what is the investigative log that we've marked this morning as Stur 5 and is now in front of you?
A. I guess I would need to look.
Q. Could you please take a look?
A. Oh, sure. No, I do not see it in here, in this document.
Q. Okay. So you reviewed the document that we've marked from this morning, Stur 5, and that information is not in there?
A. The --
Q. About the IP address that Mrs. Yeakel gave you during the initial conversation?
A. I did not see it.

Q. Okay. But your understanding is that that information, you wrote it down on a piece of paper, and it still exists somewhere?
A. Yes.
Q. Okay.
A. It should be part of this.
Q. Okay. We'll get you that. I just wanted ask you a question about Stur 5 for now. But your recollection, anyway, was that Ms. Yeakel did give you that IP address?
A. Yes.
Q. Do you remember any other parts of that first conversation?
A. I remember concluding with her, letting her know, you know, that I've taken down her information, and that, being the time of the day that it was, it was unlikely that I would have a resolution that day, and that I would be getting back with her on Monday, because she called on a Friday close to 5:00.
Q. And is that how the conversation closed, with you saying you'd get back to her on Monday?
A. Yes.

Q. Is there any information that you asked for during this conversation that she did not provide to you?
A. Not that I recall.
Q. Okay. And, in fact, you said she even volunteered some information?
A. Yes.
Q. You said you asked her whether she knew how her user ID and password had been compromised. That was one of your questions?
A. Yes.
Q. How did you know during this initial conversation that the user ID and password had been compromised?
A. She indicated when she called in that that transaction was not done by her.
Q. Okay. How do you know that it was done by somebody else using her user ID and password?
A. Well, if she said she didn't do it, yet the transaction was done under her user ID and password...
Q. How do you know -- how did you know during this initial communication that it was done

using her user ID and password?

A. We were able to look up the transaction and see it completed.

Q. You pulled up something that day as you were speaking with her?

A. Yes.

Q. What did you pull up?

A. The name of the business online banking is called e-Corp and we were able to pull an e-Corp report.

Q. So this is something you could pull up at your desk as you're speaking with somebody?

A. Yes.

Q. And do we have that e-Corp report from February 23rd, 2007?

A. Within your documents here?

Q. Yes.

A. I believe so.

Q. That's something that you kept and you would've turned over to the lawyers?

A. Yes.

Q. Okay. And in that e-Corp report, you could tell that somebody used the Yeakels' ID and password?

A. Yes.

Q. Okay. Let's find that document so you can show me where it says that. Could you identify it if you look for it?

A. Yes.

Q. Could you look and tell me which one it is?

A. 205.

Q. All right. May I? Is Bates 205 the screen you would have looked at that day?

A. That's the report, yes.

Q. Okay. The thing you called the e-Corp report?

A. Yes.

Q. Okay. I'm going to pull it out from the stack so we can mark it as Milne 1.

(Document marked as Milne Exhibit No. 1 for identification.)

BY MR. SOUMILAS:

Q. And before we get to Milne 1, ma'am, tell me generally what is an e-Corp report in your business?

A. It's a record of the transactions that were completed by the customers. So in other words,

you can see, like, what screens they accessed, and if they did transfers, or wires, or whatever the amenity is they're using, you can -- there's a time stamp on that.

Q. And is that for any type of transaction, or just the ones that are online? In other words, if somebody were to come to the bank to make a deposit, would that also show up on the e-Corp report?

A. No. Not -- it does not capture -- e-Corp reports capture what happens inside of e-Corp. So your question, if I understand it correctly, if someone came into the teller line, is that going to show as a line item within e-Corp, no.

Q. Okay. What are the type of transactions that happen within e-Corp?

A. Wire transfers, ACH transactions, viewing of accounts, in other words like an inquiry, taking a look at current day work, in other words presentments.

Q. What's an ACH?

A. What's an ACH?

Q. Yeah.

A. An electronic transaction that is done

through the clearinghouse, automated clearinghouse.

Q. Okay. Are all these type of transactions that we're talking about transactions that have been online? In other words, viewing your account online, or transferring funds online, or initiating a wire transfer online?

A. If you mean online within business online banking.

Q. I mean are all of the transactions that is -- that are memorialized within e-Corp transactions that are done on the computer, as opposed to in the branch or someplace else?

A. Are those your -- your question is: Are those recorded here?

Q. Yes.

A. Yes.

Q. And all of those are recorded there?

A. Yes. Anything done within e-Corp is recorded in an e-Corp report.

Q. Okay. But other transactions, if they be at a branch or, I don't know, if you have a closing on a home product, that would not be within e-Corp?

A. It would not be captured as a line

item in this report.

Q. The e-Corp reports, are they something that are updated -- that are available to the bank as the transactions happen?

A. The following day.

Q. And is that something that the bank regularly monitors, or is it a record that you would refer to if there's a dispute, such as in this case?

MR. BROWN: I'm going to object. The question is vague and it's compound.

BY MR. SOUMILAS:

Q. You can answer it if you understand it, ma'am.

A. So your question is: Is this particular report -- is this something that we look at regularly, or just in a disputed transaction?

Q. Yes.

A. This particular report is not viewed regularly.

Q. Okay. The bank was not monitoring e-Corp reports for the Yeakels on a daily basis or a weekly basis prior to this dispute. Is that true?

A. Yes, it's true, we were not.

Q. Okay. The first time you pulled it up

was when you received this call and you said "Let me look at what's going on," correct?

A. Correct.

Q. Okay. So you pull this data up on your computer at the bank, and what does this data tell you about the user ID and password, the document that we've marked now as Milne 1?

A. It tells me that this client number is connected with this person's name, Marsha Shames-Yeakel, and it says that these transactions were done under the user ID and password assigned to this individual under this client name and number, Best Practices as being the name, the client number being this phone number.

Q. Okay. Where is it that it says that these transactions were done using a username and a password?

A. The linkage here indicates that to me.

Q. Okay. Is the assumption that if it's showing up as a transaction for this person that it was done using this person's ID and password?

MR. BROWN: I'll object in as much as you're characterizing it as an assumption.

MR. SOUMILAS: Well, that's my

question.

MR. BROWN: It misstates her testimony.

BY MR. SOUMILAS:

Q. Well, that's my question. Are you making that assumption that the ID and password were used when you look at this document?

A. I am confident that when I look at this document and read the information that the transaction was completed under this individual's user ID and password.

Q. And why are you confident?

A. Because I have an awareness of how the system works.

Q. Okay. And the system is supposed to work that the user ID and password is what you use to initiate transactions, correct?

A. Yes.

Q. I'm asking you whether you know for a fact, looking at Milne 1, that the user ID and password was, in fact, used for the disputed transaction that Ms. Shames-Yeakel had called you about that day?

A. Yes. I believe, in looking at this

report, that these transactions were completed under the user ID and password belonging to Marsha Shames-Yeakel.

Q. And do you believe that because that's how it's normally done?

A. Yes.

Q. In other words, this report doesn't tell you this particular password was used, correct?

MR. BROWN: I'll object to mischaracterizing her testimony again.

BY MR. SOUMILAS:

Q. Does this particular report list the user ID and password? Is it on this document anywhere and I don't see it?

MR. BROWN: I'll object. The document speaks for itself. If you want to answer the obvious question...

THE WITNESS: No, it's not on there.

BY MR. SOUMILAS:

Q. Okay. So your conclusion that their user ID and password was used is based on your experience on that's how these transactions happen, correct?

A. Right. When I look at the report, and

I see the client number, and I see the name, and I see the name of the user, that tells me that these transactions were done with that person's credentials.

Q. And a report such as Milne 1 would always lead you to make that conclusion, correct?

A. Yes.

Q. You would always think that if it's a transaction by a particular user, it was done using a user's password and ID, correct?

A. Correct.

Q. What, in fact, was typed into a computer, or what caused the particular amount of money to be transferred is not shown in the e-Corp report that we have as Milne 1?

A. Could you repeat the question?

Q. Yes. What particular password and ID, if any, were typed into a computer to initiate the disputed transaction is not shown on Milne 1?

A. That's correct.

Q. And it's not shown on any document that you have ever seen. Is that correct also?

A. I would have the ability to go in another report to find her user ID. I would not be

able to see her password.

Q. Do you know whether the disputed transaction of money going from your bank to a bank in Hawaii, in fact, was initiated by somebody using the user ID and password of the Shames-Yeakels?

A. Based on the report, it is my belief that the user ID and password that initiated these transactions, going to Hawaii and such, were belonging to Marsha Shames-Yeakel.

Q. Okay. Would you agree with me that if somebody hacked into the bank's computers and somehow obtained access to that information and made the computer wire those funds, that you don't know that by looking at Milne 1 or anything else?

MR. BROWN: Well, that question is objectionable for at least three reasons, but the only ones that I'll name is that it calls for speculation and lacks foundation.

BY MR. SOUMILAS:

Q. Okay. You can answer it still.

A. Could you repeat the question?

Q. I'll try and make it a little shorter.

MR. BROWN: I'm only trying to help you, John. It's your record.

MR. SOUMILAS: I don't know if you're trying to help me.

BY MR. SOUMILAS

Q. But I want to know why you reached that conclusion during your first conversation with them that their user ID and password is used? You're using that conclusion because you're assuming that any transaction under the name Marsha Shames-Yeakel with this ID will have to include their ID and password. Isn't that true?

A. Yeah. Any transaction that's done has to have a user ID and a password.

Q. Okay. And that's why you are -- you would've concluded back then that their user ID and password was used?

A. By looking at the report?

Q. By making that assumption that their name must be linked up with their user ID and password.

MR. BROWN: I'll object, because that mischaracterizes her testimony.

BY MR. SOUMILAS:

Q. What's the answer?

A. I believe that when I looked at that

report and I saw the transactions, it -- I concluded that the transactions did, in fact, happen, and they happened under her user ID and password.

Q. And the reason you concluded that is because it was her account?

A. Because of what I was reading on the report.

Q. But there is nothing on the report that leads you to tell you what the user ID or the password were or that they were used, correct?

A. The user ID and the password are not listed on this report. But what is listed on this report is the client number, the name of the business, and the user that conducted the transactions.

Q. Okay. Have you ever heard of a transfer of money from one bank to the other where the user ID and password were not used?

A. Not at our bank.

Q. Have you ever heard it happening at any other bank?

MR. BROWN: Are you talking about online?

BY MR. SOUMILAS:

Q. Online.

A. I don't know that that's a common occurrence.

Q. My question was whether you had ever heard of it happening, not whether it's common or not.

A. I would say no.

Q. Okay. Other than the document that we've marked as Milne 1, did you look at anything else to determine whether the Shames-Yeakels' user ID or password have been compromised?

A. At that time?

Q. Yes.

A. Not at that time.

Q. How about at a later time, at any later time?

A. Well, at a later time, I involved several other individuals in the bank, and we started an investigation.

Q. And did any subsequent investigation yield any evidence as to what password and ID were used for that disputed transaction?

A. We'd know user ID. We would never know password.

Q. Okay. So does that mean that through today, you do not know the password that was used for that transaction that's been disputed?

A. I do not know the password.

Q. Now, did you get back to Mrs. Shames-Yeakel the following Monday?

A. I believe I did.

Q. Okay. And what happened then?

A. What happened on Monday?

Q. Yes.

A. I spoke with our wire room, and explained that we needed to recall the wire.

Q. What's the wire room at the bank?

A. That's the area of the bank that actually would key stroke the request that came in. So when that request came in on the 13th of February, it came in through the e-Corp product, and it generates a piece of paper with the instructions, and it's the wire room that takes that piece of paper and keys the information off of there into the fed advantage system to send out the wire.

Q. And did, in fact, a wire in the amount of $26,500 get sent to American Savings Bank in Honolulu on February 13th, 2007, from the Yeakels'

accounts?

A. Yes.

Q. Okay. And the Monday that you came back to the bank, you requested that that money be returned?

A. Yes.

Q. Was it returned?

A. No.

Q. Why not?

A. Because the bank in Honolulu, they needed to -- since they no longer had the money because it had gone beyond that, it left from Honolulu to Austria -- they wanted contact their customer to get an okay to recall the funds, and they did, and when they went to recall the funds from Austria in order to be able to send it back to us, Austria refused.

Q. Okay.

A. So we received a message several days after -- a service message on the fed advantage system saying that Austria refused.

Q. Okay. Let's take it a step at a time. Did you personally contact anybody at the American Savings Bank in Hawaii that Monday you came back?

A. I sure did.

Q. And do you know whether anybody else in the wire room or at your direction also contacted that bank on that Monday?

A. From our -- from our -- your question is did anyone from our wire room contact Honolulu?

Q. Well, anybody at your direction, other than yourself, whether it be your wire room or somebody else who works for you?

A. On that Monday, no.

Q. Okay. So you did it personally?

A. Yeah.

Q. And did you explain to the person in Hawaii that the reason for the request is because it had been identified to you by the client as --

A. Fraud.

Q. -- fraud?

A. Yes.

Q. They told you that the money had already been wired on to Austria?

A. I believe at that point they -- I don't believe that information was shared at that point.

Q. Okay. Do you believe that at a later

point somebody told you that the money had been wired to Austria by the time you called the bank on Monday, the bank in Hawaii?

A. At some point in the chain of events, I was told by the bank in Honolulu that the money went to Austria.

Q. Did it go to Austria before you called on Monday?

A. Did the money go to Austria before I called?

Q. Yes.

A. Yes.

Q. So when we're talking about Monday, it's the 16th of February?

A. No. It happened -- the transaction happened on the 13th of February. Mrs. Yeakel contacted us on the 23rd to alert us.

Q. Oh, I'm sorry yes.

A. So I think Monday would've been, what, the 26th?

Q. Yes. I misspoke.

MR. BROWN: We'll stipulate that the 26th of February was a Monday.

BY MR. SOUMILAS:

Q. So it would have been the Monday after the 23rd that you contacted her for the first time?

A. It would've been the Monday after when?

Q. The 23rd of February, when she contacted you for the first time.

A. That's when she originally contacted us, the 23rd of February.

Q. Did you ever get an explanation from the bank in Hawaii as to why the money would not be returned even though the claim was that it was a fraudulent transfer?

A. The bank in Hawaii indicated that they needed permission from their client in order to send it back.

Q. And that does not appear to you to be within the normal protocol in the banking industry even in cases of fraud?

A. Yes.

Q. Why would they need permission from their client if it was a case of fraud?

MR. BROWN: I'm going to have to object, as much as it calls for speculation, but go ahead and answer.

BY Mr. SOUMILAS:

Q. Well you told me just now it part of the -- this is the normal protocol, even in cases of fraud?

A. It's bank -- I mean, it's bank by bank as far as the policy goes. I mean, I can't really speak on their behalf on, you know, why they do what they do. But we would have a conversation with our client on our side before we would do anything. I mean, just because the person on the other end says it's fraud, doesn't mean it's fraud.

Q. Correct. But my question simply was whether you are familiar with some protocol, even in cases of fraud, where they would need permission from their client?

A. Am I familiar with any specific case, no.

Q. Okay. Did you ever get to the bottom of who the money went to?

A. In Hawaii --

Q. Yes.

A. -- or in Austria?

Q. Well, let's start first with Hawaii.

A. Yes.

Q. It went through Hawaii to Austria?

A. That's right.

Q. When was it wired to Austria?

A. I believe the day after they took receipt of it in Hawaii, the owner of the account came in and requested a wire to Austria.

Q. And do you know who the owner of that account was?

A. The business' name is JV Financial.

Q. And is that who would've received the money in Hawaii?

A. It's that person's account, yes.

Q. Any other person?

A. Not that I'm aware of.

Q. Where did the money go to Austria?

A. The bank in Honolulu did not share that information.

Q. Did any investigation conducted by your bank reveal where in Austria the money went to?

A. Not to my knowledge.

Q. Did anybody at your bank ever try to find out where the money went in Austria, other than asking the bank in Hawaii?

A. I can speak for myself. I asked the

bank in Hawaii to give me the beneficiary and the wire transfer instructions to Austria, and they did not comply.

Q. Other than going through the bank in Hawaii, are you aware of any other efforts by you or anybody that you work with to go beyond that bank in Hawaii for information?

A. I am not aware of anything else.

Q. Okay. Now, I apologize because I don't remember. Did you tell me you got back to Mrs. Shames-Yeakel on that following Monday, the 26th of February?

A. I believe so. I mean, we had documented several conversations that we had.

Q. Okay. And did you work on investigating this dispute from the time you heard about it on the 23rd until afterwards, at some point after that?

A. Yes. I was very involved in trying to get her money back.

Q. Okay. Did -- I'm trying to establish where there's a timeframe. Your participation started on the 23rd of February. Until what point were you engaged in some type of effort to get the

money back?

A. Probably mid-March.

Q. Okay. And then your personal involvement stopped at that point?

A. Correct.

Q. All right. And did there come a point a little later than mid-March where you wrote a letter back -- you wrote a letter, I should say, to Mrs. Shames-Yeakel with the bank's response to her dispute?

A. Yes.

Q. Okay. During this time period, which I'll call February to March, 2007, when you were personally involved in handling this dispute, what else did you do, other than what you've testified about so far?

A. What else did I try to do to help her?

Q. Yes. Well, what else did you try to do to investigate the matter and help her, yes.

A. I was on the phone to the bank in Honolulu several different times. One to, you know, explain our situation, another time to say "Did you receive our return wire request? Are you going to respond to it today?" I spoke on another occasion

to a representative in the particular banking center where JV Financial does their business and spoke with that person to find out additional information, and then upon receiving the service message -- I want to say it was March 12th -- indicating that the bank in Austria was -- is not cooperating. At that point, you know, you're -- that's what you can do within your banking channel. So once they respond back saying that they're not going to send it back, I mean, there's no obligation under the law for them to send it back. It's done at that point.

Q. Other than these various calls to the bank in Honolulu, including the particular center where JV Finance does its business, did you do anything else as part as your investigation into the matter?

A. We had her -- we had Mrs. Yeakel sign a dispute form.

Q. Okay.

A. We asked her for a police report, which was never provided. I wound up picking it up myself at a later date.

Q. Okay.

A. I spoke to, via email, our core

processor to see if they could shed any light on the IP address where the transaction was received.

Q. Okay. Anything else that was part of your investigation into this dispute?

A. Just checking with our attorney, checking with our risk person, checking with our IT people to see if there was anything else that we could be doing since the avenue of recalling the wire was dead.

Q. And anything else?

A. Is it appropriate to review the notes?

Q. Oh, sure. If you want to review --

A. Okay.

Q. -- any type of note, you're more than welcome to. Just let me know what you're looking at.

A. I'm looking at 288.

Q. Okay. And what is 288, ma'am?

A. 288 is my, you know, diary, if you will, of what -- what happened, you know. It has the dates, it has questions that were asked, details, of what had happened.

Q. Okay. Is 288 and 289 part of your diary?

A. Yes.

Q. Why don't we pull those two out. I'll mark them for the record, and give them back to you.

(Document marked as Milne Exhibit No. 2 for identification.)

BY MR. SOUMILAS:

Q. Okay. And before we get into the particular notes, Ms. Milne, did you type this out yourself?

A. Yes.

Q. Was this at your work computer?

A. Yes.

Q. And how did you come to start keeping these notes? Did somebody ask you to keep notes, or how did you do that?

A. No. It's common -- if you are in an unusual situation, there's no way you're going to remember this stuff. So it's common practice to take notes on what it is. So if you're asked a question at a later date, you can refer to those notes.

Q. Okay. So you use your judgment in keeping notes about what was going on with the part of the investigation that you were handling, as you

said, between February and sometime in mid-March?

A. Yes.

Q. And the notes are between February 13th and March 12th, 2007, correct?

A. Yes.

Q. Okay. And did you keep these notes contemporaneously as things were happening?

A. Within a day or so of when they happened, sure.

Q. Okay. So for example, when we see a number of of entries on February 26th, 2007, those would've been typed in around that time?

A. Sure. Either that day or the following day.

Q. Okay. And does this memorialize, Milne 2, the investigation of activities that you personally engaged in?

A. Yes.

Q. Now, is there anything in this, Milne 2, which you learned during your investigation that just didn't make its way into your notes? You can review your notes if you'd like.

A. So your question is: Is there more information that didn't get recorded here?

Q. Yes.

A. Perhaps.

Q. Okay.

A. I would say that the pertinent stuff is here.

Q. Okay. Would you just take a moment and read through your notes and then let me know were there's any pertinent information in your investigation that's not here that you still have in your memory.

A. I don't have anything that is coming to mind at this moment that's not in here.

Q. Okay.

MR. BROWN: Let me know when we get to a breaking point.

MR. SOUMILAS: We can have a break now, sure.

MR. BROWN: Okay. Let's just take five.

(Whereupon, a break was taken, after which the following proceedings were had.)

BY MR. SOUMILAS:

Q. Now, Ms. Milne, you were telling me about the actions that you took in responding to this dispute after it came to your attention. Now that you've had a chance to review Milne 2, your notes, was there anything that you learned from your telephone calls to the bank in Hawaii that is not reflected in your notes?

A. That is not reflected in the notes?

Q. Yes.

A. No.

Q. Okay. You told me that you asked one of the Yeakels to provide you with a police report?

A. Yes, Mrs. Yeakel.

Q. Okay. And did you ask her to file a police report, or to provide you a copy of a police report?

A. She told me that she filed a police report with Lake County, and I asked her to provide us a copy of it.

Q. Okay. And you never got that copy?

A. Not from her, no.

Q. You got it on your own?

A. Correct.

Q. But there was a police report filed by

her with Lake County?

A. Yes, I was able to pick it up.

Q. And that -- was that within the first when when you handled the dispute, February to March 2007?

A. When it was filed, or when I picked it up? What is your question?

Q. When it was filed.

A. When it was filed. I can tell you when she told me it was filed.

Q. Okay.

A. She said it was filed -- I mean, she told us on February 28th that she had filed a police report with the Lake County sheriff.

Q. Okay. But she never gave you a copy of that, and you needed to go and get it from the sheriff yourself?

A. Yes.

Q. All right. And you also said that there were forms that you asked Mrs. Yeakel to fill out. This morning we marked a couple of forms that are called disputed transactions forms as Stur 12 and 13. Are these the forms that you're referring to?

A. That is the form we asked her to sign.

Q. Okay. And now 12 is a typewritten form you'll see, and then 13 has some additional handwriting on it. Do you see that?

A. I do.

Q. How did it come about that the additional handwriting was added?

A. I put together the typewritten 12.

Q. Right?

A. And I emailed it to the banking center where Mrs. Yeakel does her business.

Q. Right?

A. And our bank representative presented it to her, and Mrs. Yeakel handwrote that in.

Q. Okay. So your understanding is that the handwritten material, she wrote in herself?

A. Correct.

Q. Okay. And you also said that you contacted the core processor?

A. Yes, FiServ.

Q. What is FiServ?

A. FiServ is the service bureau that runs e-Corp, among other things in the bank.

Q. And why did you do that, why did you

contact FiServ?

A. As a way of trying to help with -- help Mrs. Yeakel retrieve her money, I asked FiServ if they could tell us the IP address connected to the transactions.

Q. Okay. And did they do that?

A. No.

Q. What did FiServ tell you about the IP address?

A. They said they could not retrieve that information for me.

Q. Okay. Was there a time, then, that you actually wrote an email back to Mrs. Shames-Yeakel about that every time?

A. Mrs. Yeakel emailed me first, and I did respond to her.

Q. Okay. I'll ask you to take a look at Bates 163 in the documents in front of you. They might be in the middle pile that's correctly in front of you. Is that the email communication that you were just referring to?

A. Yes.

Q. May I have it, please? Let's mark this one page as Milne 3.

(Document marked as Milne Exhibit No. 3 for identification.)

BY MR. SOUMILAS:

Q. Now, do you recall earlier in your deposition, ma'am, that you told me in the very first conversation you asked Mrs. Shames-Yeakel for her IP address, correct?

A. Yes.

Q. And then you write back to her following her inquiry that the reason you asked for the IP address was because "I was hoping that our core processor, FiServ, would be able to tell me the address or the machine where the transaction was completed." That's your email?

A. Yes.

Q. "Unfortunately, they cannot."

A. Yes.

Q. Has that result changed since your email of March 23rd, 2007?

A. I don't believe so. I believe FiServ maintains they cannot tell us the IP address.

Q. Okay. So I presume you give the FiServ company the IP address that Mrs. Shames-Yeakel had given you on that first phone

conversation, and you asked her to ask them to look that up?

A. I did not.

Q. You did not give them that information?

A. (Nodding).

Q. You just simply asked them what?

A. There should be an email that reflects it. I said "Do you have a way -- we have a customer that is indicating that there's a large dollar transaction that occurred in the e-Corp product that they did not initiate."

Q. Right.

A. "Do you have a way of looking up the IP address to tell us the address of the computer that initiated that transaction?"

Q. Okay. And their response was "No, we don't know?"

A. No.

Q. No, that wasn't their response?

A. Yes, it was their response. No, they couldn't give it to us.

Q. Okay. Thank you. And then upon an inquiry by Mrs. Shames-Yeakel, you tell her that,

correct?

A. That was the second time I told her that, yes.

Q. All right. You had also told her over the telephone?

A. Yes.

Q. Okay. So in as far as you know, that never changed in any investigation that you were conducting?

A. Right. The actual IP address is -- we're not able to get it.

Q. Did anyone other than FiServ give you the IP address of the machine where the transaction was actually completed?

A. FiServ did not give me the IP address.

Q. I'm sorry if I wasn't clear. Other than FiServ, did you go to any other source to try to find out that IP address?

A. I did not.

Q. Okay. Do you know whether in any investigation that the bank conducted they went someplace else?

A. Rebecca Rees, our senior of information technology, conducted her own research.

Q. Okay.

A. And I believe that that's represented here somewhere as well.

Q. Okay.

A. I can't speak to what she did or how she did it.

Q. You personally have never seen an answer to that question, namely where was the transaction completed?

A. I have never seen the IP address, other than what Mrs. Yeakel gave me.

Q. Okay. You've only seen Mrs. Yeakel's IP address. You haven't seen any other IP address about the machine of where the transaction was completed?

A. Not the IP address --

Q. Okay.

A. -- for the machine.

Q. Now, other than what you've testified about already, did you have any other part of your investigation that involved FiServ for the core processor?

A. No, I believe that was it. My inquiry to them about "Can you help me out with this IP

address?"

Q. Okay. Now you also mentioned that you contacted counsel about this issue, correct?

A. Yeah.

Q. And I understand that your attorneys in this case are going to invoke the attorney-client privilege about your communications with counsel?

MR. BROWN: Well, the privilege belongs to the client, as you know, and the client is invoking the privilege. That's how the attorney-client privilege works.

MR. SOUMILAS: Yeah, I know who the privilege belongs to, but you're invoking it, right? Ms. Milne didn't do it.

MR. BROWN: Citizens Bank is invoking the attorney client privilege.

MR. SOUMILAS: That's what I figured.

MR. BROWN: It belongs to them.

MR. SOUMILAS: That's what I figured.

BY MR. SOUMILAS:

Q. What I want to ask you without telling me any -- what was said between you and any lawyer, I want to look at Milne 2, which are your notes. These are all your notes? You made these notes?

A. Yes.
Q. Do you refer to yourself in the third person?
A. It's shorter to write that way.
Q. So for example on, you know, whatever, February 26th, the second entry, "Milne called AM SL, Honolulu." That's you writing that?
A. Yes.
Q. Okay. The last entry on February 26th, which is that Monday, 2007, you spoke with Brian Goins to alert him of the situation. Do you see that?
A. Yes.
Q. That's an attorney at the Hinshaw firm?
A. Yes.
Q. And that's the first time you spoke with him about the situation?
A. As long as we don't see his name anywhere else, yes.
Q. Okay. And again, without telling me what was said, did there ever come a time when you received any opinion from the attorney about the situation? Don't tell me what the opinion was,

whether you ever got on opinion from the lawyers, or the lawyers never returned your call. I don't know, it happens.
A. So your question is: Did I get an opinion about the situation?
Q. Yes.
A. I would say yes. I mean, the reason for the call was to explain what was happening, and to get consultation on "What do you need me to be doing," type of thing.
Q. Okay. I'm just asking you very specific questions, because through counsel, the bank has invoked the privilege of those communications. I'm not going to ask what was said or what was communicated. I just want to know when it was done and whether you got a response, and the answer is you did, correct?
A. Yes.
Q. And the other law firm that you mentioned that you contacted also, did you get a response from them?
A. Yes.
Q. Okay. And that was their opinion about the situation?

A. Yes.
Q. Okay. Did these opinions ever come in any written form, or were they just phone conversations, the attorney opinions?
A. Well, definitely phone. I guess let me clarify the question. To me directly? Because certainly, I'm sure that you realize that the attorneys spoke with several people in the bank.
Q. Sure.
A. So I'll just answer the question for myself.
Q. Yes.
A. And I would say that it was phone only.
Q. Okay. And have you personally ever seen any written advice from any of the attorneys about the situation that you were investigating in the February/March 2007 timeframe?
A. Well, does the response letter count as under your question of written material of an opinion?
Q. Well, without telling me what the communication was, I just want you to tell me whether you saw anything in writing or not.

A. Yes.
Q. Okay. Then we're going to have to leave it at that for now, at least. And have we covered your entire investigation into this matter, ma'am? In other words, have we talked about all the calls you made, the people -- the documents you looked at, the places you went to for information, everything you did in your investigation?
A. I would say yes.
Q. The initial call you told me was the 23rd of February, 2007?
A. The initial call when Mrs. Yeakel called in to report it?
Q. Yes.
A. It was the 23rd.
Q. And the initial written dispute, was it in the form of these dispute -- the disputed transaction form that we've seen as Stur 12 and 13?
A. Yeah. That was on the 28th of February, where that document was presented to Mrs. Yeakel.
Q. And when was it presented back to the bank?
A. Well, on 2/28, she refused to sign it.

Q. Okay.
A. Due to the hold harmless and indemnify the bank sentence.
Q. Right.
A. But then apparently she changed her mind, and on March 2nd, she dropped off the signed form.
Q. Okay. And this is a form that's used by the bank for this type of a disputed transaction?
A. It's the first of its kind. That is what we used.
Q. Did you create it for this case, or is that the first occasion that you've seen it being used? Do you understand my question?
A. Yeah.
Q. In other words, was this form created for the Shames-Yeakel situation?
A. The disputed transaction form is typically used for ATM transactions.
Q. Okay.
A. But being that that was not the case, we made a couple of adjustments to fit the the situation.
Q. Okay. So the form generally existed,

but it was tailored for ATM-type disputes?
A. Yeah. The original existence of the form is for ATMs, but being that this was not an ATM dispute --
Q. Right.
A. -- this was a business online banking dispute --
Q. Right.
A. -- we made a couple of adjustments to it to fit the situations.
Q. Was the hold harmless language one of the adjustments?
A. I don't recall.
Q. But the bank would've had a copy of how this form looked like, as it was used in the normal course of business back in February of 2007?
A. Yes.
Q. I'm sure you said March 2nd was the date it was actually received, correct?
A. Yes.
Q. All right. Now did you respond in writing to that initial call on the followup dispute form with a letter to Mrs. Shames-Yeakel?
A. Yes. There was, I believe, a couple

of letters.
Q. All right. I will show you what's been produced to us as a draft of a letter. It is Bates 169 and 70. Let me find it for you. Are we up to Milne 4. Let's mark it as Milne 4.
(Document marked as Milne Exhibit No. 4 for identification.)
BY MR. SOUMILAS:
Q. Have you seen this document before, ma'am?
A. Yes.
Q. Have you seen it in this draft form?
A. Yes.
Q. Whose writing is on the document with the carbon copies and the squiggly line all through the last paragraph?
A. That is mine.
Q. And did you write this letter?
A. Not alone. In collaboration with others in the bank.
Q. Okay. Are there parts of the letter that you wrote yourself?
A. Yes, I was part of a collaborative effort to put it together.

Q. All right. And were you the one, if you will, spearheading the investigation at this early juncture, February to March?
A. I would say I was the point of contact with Mrs. Yeakel.
Q. So you were the person who got the -- you're the, I guess, upper management person who got the first dispute. Somebody else answered the phone initially you said, correct?
A. That's right.
Q. And you're the one who's made a lot of these efforts to investigate the matter, correct?
A. Yes.
Q. And you were the one who was going to sign the response?
A. Yes.
Q. But you didn't write the entire letter yourself, it was a collaborative effort?
A. That's true.
Q. I will show you a document without any Bates stamps, which I will mark as Milne 5.
(Document marked as Milne Exhibit No. 5 for identification.)
BY MR. SOUMILAS:

Q. And ma'am, is Milne 5 the final version of the letter that we just saw in draft format as Milne 4?

A. Yes.

Q. Is that your signature on it?

A. Yes.

Q. You mentioned a couple of letters in responding to the plaintiffs' disputes. Was there another letter responding to this initial dispute that you wrote?

A. No. I believe the other letter that I was referencing was nearer to the end of the situation.

Q. Do you know the timeframe? When you say "near to the end," what do you mean?

A. Mrs. Yeakel wrote us twice.

Q. Right.

A. And we wrote her twice. So, you know, perhaps it was before this instead of after this.

Q. Let's try to --

A. I believe it's still after this.

Q. Let's try to sort it out for the record. Do you believe that the document, the final version of the document --

A. Of this document?

Q. -- Milne 5, right -- is the bank's initial response to the complaint that you fielded by telephone at first on February 23rd --

A. I would say so.

Q. 2007 I was going to say.

A. Because there's not much of a time difference.

Q. Correct.

A. Do you know what I mean? It was the March 23rd and this is the -- March 8th.

Q. Okay. So I want to try to find that second letter that you said you wrote, and try to figure out the context of what you wrote in that letter. Just give me a moment.

MR. SOUMILAS: Let's go off the record.

(Whereupon, a discussion was had off the record.)

BY MR. SOUMILAS:

Q. Both I and you and your attorney reviewed the entire production that was made available to us, and we haven't found the second letter. You think you're mistaken that there was

only a single letter?

A. Yes.

Q. So the one that we've marked as Milne 5 is a final version of the one and only letter you wrote back to the Yeakels?

MR. BROWN: Well, let's be clear. I mean, we've looked through the documents and we didn't find it. I mean, the documents are speaking for themselves. So I would object in as much as you're asking her to specify if we went over the letters.

BY MR. SOUMILAS:

Q. Okay. Well, let's flush that out, given your were attorney's objection. None of us -- you certainly did not see any other letter in the documents that we have in front of us, correct?

A. Correct.

Q. And you told me all the letters that you had a copy of and documents you turned over to your lawyers, correct?

A. Yes, correct.

Q. And as we sit here today, you don't have a specific recollection of writing a second letter, correct?

A. Correct.

Q. All right. So the one letter we have is the one we've marked as Milne 5?

A. Correct.

Q. And that is the response to the initial dispute that came to you on March 23rd?

A. Correct.

Q. All right. And is this a letter that accurately and completely sets forth the bank's response to that dispute?

A. Yes.

Q. I know you didn't write it all yourself, it was collaborative, but you read it before you signed it, correct?

A. Correct.

Q. And it's all there?

A. What was put together and what was mailed to her is all here.

Q. Okay. Did you draw any conclusions during the February/March 2007 timeframe when you were spearheading that investigation as to who initiated this transfer of money from your bank to the bank in Hawaii?

MR. BROWN: I'll object in as much as

the word "spearheading" misstates the evidence.

BY MR. SOUMILAS:

Q. Okay. You can answer.

A. So your question is: Did I make my own opinion on who did the transaction?

Q. I can't ask an opinion, but when you were conducting the investigation that you conducted in February and March -- and we talked about that in some detail, correct?

A. Yes.

Q. Did your investigation conclude who initiated the transaction that caused the money to go from your bank to a bank in Hawaii?

A. I believe we concluded that Marsha Shames-Yeakel handled that transaction, initiated that transaction.

Q. Okay. And at what point did your investigation reach that conclusion?

A. Well --

Q. Would it be fair to say at some point between the initial call that alerted you to this issue, February 23rd, and the time of your letter back, which was March 21st, 2007?

A. That would be correct.

Q. Could you pinpoint the date more exactly, or you just don't know?

A. I would say it would be at the time of the letter.

Q. Okay. And did your investigation pursue any other person or entity that may have initiated this transaction?

A. Did we pursue anyone else who could have --

Q. That wasn't the best question. I know you told me what you concluded, correct?

A. Yes.

Q. In reaching that conclusion, was there -- were there other people that you looked into to see whether they were the people who initiated the transaction?

A. We looked at other people's transaction log in the e-Corp reports to get an idea of behavior and history.

Q. Okay. By other people you mean other customers?

A. The other user connected to best practices.

Q. Who's that?

A. Mr. Yeakel.

Q. Okay. So you determined that it was Mrs. Shames-Yeakel who did it?

A. We determined that the transaction came in under Mrs. Shames-Yeakel's credentials.

Q. And you considered Mr. Shames-Yeakel in conducting your investigation into who initiated this transaction?

A. Yes, we looked at his activity as well.

Q. Did you consider anybody else?

A. I'm not sure how to answer that. We couldn't look at anyone -- there was no one else's activity that we could view.

Q. Well, your notes, for example, ma'am, that we've marked as Milne 2, make several references to JV Financial as the place where the money went.

A. Yes.

Q. Do you see that?

A. Mm-hmm.

Q. Was there anybody at JV Financial -- excuse me -- that you considered as a possible

suspect into who wired this money?

A. All we know about JV Financial is that they were the recipient of the funds.

Q. So what's the answer to my question of whether there was anybody from JV Financial that was a suspect or a target in your investigation?

A. I did not personally go any deeper with JV Financial. I guess -- well, let me restate that. We, of course, spoke to the folks at the bank in Honolulu. The only other thing that I could do within my means, I looked JV Financial up on the Secretary of State web site for Hawaii. I was -- wanted know if they were a legitimate business. I also placed a phone call, based on the white pages phone number that I was able to look up, to JV Financial. And I did that while I was waiting and hoping that the bank in Honolulu would return to us the wire. Honestly, I wasn't very -- I thought it was very doubtful that they would send it back, so I didn't just want to wait for that. So I tried doing other things within my means, like trying to contact them directly to get the money back.

Q. And did you ever get to the bottom of that?

A. No. On the log here, on 2/26, I contacted them and I didn't get a person. I got a, you know, answering machine, and it appeared to be a personal residence, and I left a message, and I didn't hear anything back.

Q. Okay. So you told me what your investigation concluded on the general timeframe of when it concluded it by March 21, 2007. What was the information you looked at in reaching that conclusion?

A. The e-Corp reports.

Q. So that was the first document we looked at, Milne 1, correct?

A. Right.

Q. Anything else?

A. So your question is: What -- what all did we use to make a conclusion that it was done under her user ID and password. Is that your question?

Q. Not exactly. I think you went through the investigation process with me, and I don't want to repeat that. But you did tell me that the response to the dispute was Milne 5, the March 21, 2007, letter, correct?

A. Yes.

Q. And you also told me that by the time of this letter, the bank had concluded that it was Marsha Shames-Yeakel who had initiated the transaction, correct?

A. Correct.

Q. Okay. Other than what you've testified about already, including the e-Corp report --

A. Mm-hmm.

Q. -- was there any other document or information that led you to that conclusion?

A. Nothing in addition to what we've already covered.

Q. Okay. Now you would agree with me that in your letter of March 21, 2007, you don't tell her anything about the fact that the bank determined that she had initiated this transaction?

A. In the letter, we're basically telling her from our account what has happened and what we have done. And again, it's a response to a letter that she wrote, in which I believe she's saying that she was defrauded, and we are saying that we tried to get her money back, and tried to investigate her

fraud, and we basically came up with nothing. And at this point, we were basically done. You know, there was nothing else that we could do.

Q. Okay. Did you tell anybody else within the bank that you had concluded that Mrs. Shames-Yeakel had initiated the transaction that caused the money to go from your bank to the bank in Hawaii?

A. Basically all the people that we listed in the initial -- you know, all the people that were in the know, Mr. Prisby, Rebecca, Carol, Brian, Tom Darovic, those -- all of those folks knew our position.

Q. And you told those folks your conclusion?

A. The bank's conclusion, yes.

Q. The bank's conclusion. Okay. I want to ask you to please look at a few more documents, ma'am. One is a letter that is not Bates stamped again, but it's a letter that we produced that is written from the Yeakels directly to you. Let's mark it Milne 6.

(Document marked as Milne Exhibit No. 6 for identification.)

BY MR. SOUMILAS:

Q. Do you recall receiving this letter, Ms. Milne?

A. Yes.

Q. Did you have -- do you have any recollection or any record of writing back in response to this June 6th, 2007, letter?

A. No.

Q. I'd like you to next take a look at a document that is Bates 177.

MR. BROWN: It's probably in this stack here.

MR. SOUMILAS: Maybe that. Oh, no. Okay. Let's pull that out, please.

(Document marked as Milne Exhibit No. 7 for identification.)

BY MR. SOUMILAS:

Q. Ms. Milne, what is Milne 7?

A. What is Milne 7?

Q. Yes. It has your name at the top left there.

A. Well, I'll start at the bottom and go up. It's an email that I sent to Carol Romes, our risk and compliance person, and it looks like

there's an attachment there. You can't really see it, but it says "File," it's a SAR, and I had cut and paste my diary, that we called it, into the SAR for Carol. And then it looks like at -- then moving up -- then it looks like after Carol reviewed my slice that I put in there, she had some questions, and I went ahead and answered her questions.

Q. Okay. And what was the purpose of your sending your diary, which we've marked as Milne 2, correct?

A. Yeah.

Q. What was your purpose of sending the text of Milne 2 as a SAR document to Ms. Carol Romes?

A. Carol indicated that we -- she needed to complete a SAR, and she asked me to fill in my account of what had happened thus far.

Q. And what was the purpose of that, to your understanding? What is the purpose of completing a SAR?

A. Well, I believe that there's a variety of reasons to complete a SAR. As far as -- I don't know that it's appropriate for me to comment on -- because I don't know that I'll give you the right

answer -- as far as why Carol felt we needed to do a SAR for this.

Q. So she asked you for that information and you gave it to her?

A. Yeah.

Q. Now you said you responded, and is your response in capital letters next to the questions?

A. Yes.

Q. Okay. And one of the questions about, I guess, the fifth one down in bullets, it says "Do we have a list of all people that were at the location where the laptop used to request this transfer was made." What laptop is she referring to?

A. I think she used the term laptop -- she could have said "laptop," she could have said "desktop," she could've used the word "computer." It was Carol's way to say what terminal -- where it was done.

Q. Okay. So there's no finding that this was done through a laptop? That was just --

A. No.

Q. Okay. And your response is "We do not

know what computer was used."

A. Mm-hmm.

Q. Yes?

A. That is yes.

Q. And has that answer changed -- based on anything else you know through the present, do you know what computer was used?

A. When that question was asked of me then and even now, I look at it as was it -- I know, or I believe, that it was Mrs. Shames-Yeakel's computer. Now, was it the computer in her office or was it a laptop that she moves around in her home, I can't answer that question. All I can draw on is what she originally told me that, you know, when I asked her the question about the user ID and her password, you know, her password being kept in the lap drawer, assuming, you know, if you're somewhere at a desk, typically your computer is here, your lap drawer is here. I don't know anything more concrete than that.

Q. Okay. So what you're saying here as part of your response is you don't know where Mrs. Shames-Yeakel may have logged on to a computer? It could've been at a hotel, it could've been at her

sister's house, it could've been someplace else, correct?

A. Well, based on the conversation I had with her, it was in her home.

Q. When you say "We do not know what computer was used," what do you mean by that?

A. I mean -- again, perhaps -- some people have multiple computers in their home.

Q. Right.

A. A computer that's a desktop, a computer that's a laptop that could maybe move around in her home.

Q. Do you know that it was within her home?

A. Mrs. Yeakel runs the Best Practices out of her home. She stated that.

Q. I know that, but my question is: Was the computer -- the location of the computer where this transfer was made, was it within the Yeakels' home?

A. I don't know that I know that.

Q. Could it have been, as I suggested, a hotel, or an internet cafe, or a relative's home, or any other place?

A. You can use your credentials anywhere you have internet access.

Q. Okay. Let's move on to another document that bears your name. It is at Bates 153 and 54. I'll get it for you, ma'am.

MR. SOUMILAS: Let's mark this as whatever the next exhibit is.

(Document marked as Milne Exhibit No. 8 for identification.)

BY MR. SOUMILAS:

Q. This is another email message with your name on the top left, Mrs. Milne, a two-page sequence of emails, and this was from April 2007. What was going on here?

A. This was me asking a question to our rep at FiServ asking if they can help with this IP address.

Q. Is this the email that you had referenced earlier in your testimony about your communication with FiServ?

A. Yes.

Q. Okay. So that communication was made in April 2007?

A. Yes.

Q. Okay. Your communication back to Mrs. Shames-Yeakel was made in March 2007?

A. Mm-hmm.

Q. That's a yes also?

A. Yes, sorry.

Q. All right. The --

A. In addition to this, so prior to this, Rebecca had posed the question as well to FiServ, and I don't know if you have that somewhere.

Q. I don't know if I have. Have you posed the question before?

A. Rebecca, our IT person who is the direct link with FiServ.

Q. I heard that. My question was whether you had posed the question before?

A. No.

Q. You personally?

A. No.

Q. Okay. This communication from April 2007, does this refer to the Shames-Yeakels?

A. Yes.

Q. Okay. And who is Linda -- Steil is it pronounced?

A. Steil.

Q. Steil.

A. She's our rep at FiServ.

Q. Okay. So that's your contact person?

A. Yes.

Q. If you have a question, that's who you would call or communicate with?

A. She is one of many people. Basically depending on the type of question you have, you're assigned specific individuals with that expertise.

Q. Got it. There's a question here to you, "Do you know if this consumer was enrolled in your multifactor authentication and if this happened after she was given the token?" Do you see that right at the very top?

A. Yes, I see it.

Q. Okay. What is that making reference to?

A. The multifactor authentication is a token, and the token would replace your password, and when you hit the button on the token, it gives you a different eight-digit number every 30 seconds. You would need to take that eight-digit number plus a four-digit pin that you established once you were given your pin. So you would take the eight digits

and the four digits and you would populate the password field along with your user ID.

Q. Okay. When you used the word "token" your industry -- or in this context, I should say, are we talking about some object?

A. Yes.

Q. And does it look like tokens people used to use in the subway? What does it look like?

A. It's kind of like an oval device that you can attach to your key chain, if you want to. It's pretty small and compact. It's got a little screen on it so you can read the digits, and it's got a little button that you can press to make the digits appear.

Q. Got it. And when was the token feature rolled out for internet banking at your bank?

A. At the time that this happened, it was in progress for maybe six weeks. We were maybe into the process of getting those issued to our clients.

Q. And what was the purpose of the token?

A. Increase security.

Q. Prior to the token, was the information that someone needed to log on just a

username and password?
A. It was a user ID and a password.
Q. Okay. And the token enhanced that security, if you will?
A. Mm-hmm. Because what it's doing is it's replacing the password with this device that has an ever-changing number.
Q. And at what point, if you can tell me, did the bank begin to roll out the process of the token?
A. About six weeks before this happened.
Q. So early 2007?
A. Yes, that would be accurate.
Q. Do you know how long the roll out period lasted until every customer got a token?
A. I don't have an exact date, but I would say it probably took us six months to get them out.
Q. Okay. And what is the part of the email that references a multifactor authentication? What does that mean in your line of work?
A. Issuing a token.
Q. What is multifactor authentication? Is it -- could it be done any other way, other than

the token?
A. Yeah, there's other opportunities for multifactor. Instead of using a token, you could use an image, the picture technology on the screen. So in other words, a customer could pick a picture, and when they log in, their picture needs to come up, you know, the picture that they selected, and if there's a match, it's giving the security to the customer that they haven't been spoofed, that they are a legitimate site.
Q. So is it some additional factor of authenticating that the customer who is doing the online banking is, in fact, that customer?
A. That it is, in fact, the customer and that they've reached a legitimate Citizens web site.
Q. Right. Do you know whether the Shames-Yeakels were given the token by Citizens as of the February 13th, 2007, timeframe?
A. They have not been -- they had not received the token yet.
Q. Do you know whether a point came along where they were sent or received the token?
A. No, they were not on the list at that point, you know what I mean? We were doing blocks

of clients where we were issuing --
Q. Right.
A. -- and at the point where this happened, we had not gotten to them on the list.
Q. Did there ever come a point where they were issued a token?
A. They were never issued the token.
Q. Okay. I'd like to next turn your attention to another document that was produced by the bank. I believe we'll mark this as Milne 9.
(Document marked as Milne Exhibit No. 9 for identification.)
BY MR. SOUMILAS:
Q. Again, Ms. Milne, it's an email with your name on the top left. What is this?
A. Again, starting from the bottom going up, this is a copy of the service message that I received from the wire room indicating that the Beneficiary Bank has refused to return the wire.
Q. And directing your attention to the message of March 12th, 2007, that's all in caps?
A. Yes.
Q. It seems to be full of abbreviations and codes. Could you read that in plain English?

A. Yeah. This is the service message exactly the way it comes across. She actually just cut it and pasted it in there.
Q. Right.
A. And it's attention Laura Samano, regarding -- we'll just -- we'll skip the year, the YR and REVL, required IMAD number, and the Q number all the way through the eight, that's IMAD. What that is is that's the number. When you send a wire, it gets assigned this IMAD number, like this outgoing number. So it's restating what that was from the original transaction.
Q. Okay.
A. Dated 2/26/07 regarding 2007, again the number there, the 0213, the date of the original, for $26,500. "Beneficiary refused to return funds. Regards, Reba." Reba's the lady in the wire room there at the Honolulu bank.
Q. Your understanding is that this is the message that came from the bank in Hawaii to your bank's wire room?
A. Correct.
Q. And then was forwarded on to you?
A. Yeah.

Q. And then you forwarded the message on to several people, correct?
A. Yes.
Q. Who are those people?
A. Monica Sullivan is our corporate secretary. She's the secretary for Tom Prisby.
Q. Okay.
A. Tom Darovic was my direct manager, and Carol Romes is our risk compliance person.
Q. And was there anything else done following this message to try to investigate the matter or retrieve the funds?
A. There was nothing else that I did after that.
Q. Part of your message to those three people is that "The way I see it, we have exhausted everything we can do?"
A. Yeah. As far as the banking channels go, again, there's a protocol regarding wire. I mean, there's laws that govern it. There is no requirement that the beneficiary return the money, and when you get a message like this, game over. They're not going to send it back. They are not required to send it back. You can't make them send

it back.
Q. The first part of your message says "It looks like I'll need to call Hawaii this afternoon."
A. "It looks like I do not need to call Hawaii this afternoon."
Q. Oh, I'm sorry. "I do not need to call." And does that mean that you were waiting for a response from Hawaii?
A. Yes.
Q. And because of this response, game is over?
A. Mm-hmm.
Q. Is that a yes?
A. Yes.
Q. Okay. And do you know why it takes about nine days --
A. To get a response?
Q. -- to get a response to the Shames-Yeakels, yes?
A. It's my experience that when you're dealing with international, it always takes longer.
Q. Oh, I'm sorry. I think I meant to ask a different question. Do you know why it takes

about nine days between your email on March 12th, 2007, and your letter to Mrs. Shames-Yeakel, that we've marked as Milne 5?
A. Why are there a number of days between there -- that and that?
Q. Yeah.
A. The -- I believe that the matter was still being discussed at administrative level and with the various attorneys before they were ready to do a response.
Q. Do you know whether anything else was done in terms of an investigation or efforts to get the money back after March 1st, 2007?
A. I did not do anything beyond that.
Q. Okay.
MR. BROWN: Any time good for a break?
MR. SOUMILAS: We can take one now.
MR. BROWN: All right.
MR. SOUMILAS: I have just a few more documents to go through. I would estimate, I don't know, 15 or 20 minutes after the break.
(Whereupon, a break was taken, after which the following proceedings were had.)

BY MR. SOUMILAS:
Q. Mrs. Milne, earlier in the deposition, I asked you to take a look at the document Stur 5, which is the investigative log. Do you remember this?
A. Yes.
Q. Did you prepare that document?
A. No.
Q. Do you know who prepared it?
A. I believe Carol Romes prepared that in collaboration with, certainly, Rebecca. This is her handy work on the back.
Q. Rebecca?
A. Rees.
Q. Rees. And Mrs. Romes is risk management?
A. And compliance, yes.
Q. Do you know when she would've prepared that?
A. Well, it looks like she prepared it June 22nd of '07.
Q. And you're pointing to the bottom left-hand side of Page 4?
MR. BROWN: Right-hand side.

THE WITNESS: Right-hand side.

BY MR. SOUMILAS:

Q. Yes, you're right. Your right, my left. May I have the other documents back?

A. This?

Q. Yes. Other than your notes, which we marked as Milne 2, and we sometimes referred to as the diary --

A. Yes.

Q. -- do you have any other records or notes of any investigation into the Shames-Yeakel disputes that you were a part of?

A. Everything that I had was surrendered over.

Q. I believe that, ma'am, but there was a pretty good pile of documents. So I'm trying to understand whether you personally had some other notes or some other file that you could tell me about, or whether we've reviewed your records of the investigation?

A. I believe we've reviewed my records.

Q. I want to you take a look at this document, Bates 198. Do you know whose handwriting this is?

A. Mine.

Q. Okay. If it is your handwriting, I'm going to ask that we mark this as the next exhibit.

(Document marked as Milne Exhibit No. 10 for identification.)

BY MR. SOUMILAS:

Q. And how did it come about that your handwriting went on the document that we've now marked as Milne 10?

A. I asked our accounting department for a copy of the wire request from Mrs. Yeakel that was dated 2/13. So these are the instructions that we received and acted on, and my handwriting here to the right, American Savings of Honolulu, you know, I didn't know what AM SL -- so I had to look that up.

Q. Right.

A. And we've got some phone numbers here, and the Nicole is the -- when I called their general number, that's who I got in, like, their call center, and then, you know, learned that Reba was the wire room lady contact, and the 1007 is the number that goes along when you do -- when you do a reversal request of a wire, it's called a 1007 reversal.

Q. Were these notes that you made as you were speaking with Mrs. Shames-Yeakel on that Friday afternoon, or was it done later?

A. I would say it was later.

Q. Okay. There's a date on the bottom right.

A. Yeah, 2/23/07.

Q. Right. So it was done on that date, but after your call?

A. I would say yes.

Q. What is the identifier, which is listed right above JV Financial Corporation with a Honolulu address?

A. In the beneficiary section?

Q. Yes.

A. That's the account number -- I would believe that that's the account number belonging to JV Financial, and I can further tell that that account number is a DDA account.

Q. What does that mean?

A. Like a checking. A checking or a money market is a DDA.

Q. Is that the account that the money went into?

A. That is -- based on the wire instructions, that's where it should be -- is asked to be routed to.

Q. Okay. And the numbers next to the sender information where the two banks are identified --

A. Yes.

Q. -- what are those numbers?

A. The sender, ABA, that's Citizens Financial Bank's ABA number. In other words, our identifier, and the receiver, ABA belongs to the American Savings of Honolulu, that's their number, their ABA.

Q. Got it. Explain to me the process of how it is that an electronic command on the Citizens computer would trigger this type of a wire. In other words, does this piece of paper get printed out someplace?

A. Yeah.

Q. It does?

A. Yes.

Q. In the wire center?

A. Yes.

Q. And somebody, as you said, keys it in?

A. To the -- what they call the fed advantage terminal, which is the wire terminal.

Q. Got it. And that would've been done on the 13th of February, 2007, at 2:25 in the afternoon?

A. Yes.

Q. All right. Does the wire transfer department at the bank have any written policies or procedures that it follows before it were to wire out any money?

A. Before I answer that question, I think we need to step back.

Q. Sure.

A. This printout is from the fed line terminal. So this is what was keyed in, and the reason I say that is because it's giving me the IMAD and the OMAD number and all of that. I think what we were talking about before -- I just want to be clear, you had asked "Well, does this print out and then the person goes to the fed advantage machine and then type it in?" Yes, but that's another piece of paper.

Q. Okay. So it's another piece of paper that prints out, and the piece of paper that we've

marked as Milne 10, which also includes your notes, is the piece of paper that confirms the transaction after somebody at Citizens typed it in, correct?

A. Right.

Q. So what I was trying to ask before is whether there's some written protocol that people at Citizens would follow before wiring $26,500 to a bank in Hawaii?

A. Our business online banking agreement states that if we receive wire requests under -- you know, from a valid user ID and password that we follow those instructions.

Q. You may very well say that. My question was simply whether the wire transfer department at your bank has some written protocol as to what to do?

A. They -- the wire room goes into the area of the e-Corp product and pulls down wire requests that come in, they print them out, and they process them. Period.

Q. I don't mean to be difficult, ma'am, but my question simply was: Is that procedure written down someplace at the bank? If I wanted to learn it, how to wire money from Citizens bank --

A. Yeah, there's a policy and procedure on that.

Q. And it's written down?

A. Yes.

Q. Okay. And it's in the wire room, that policy and procedure?

A. Yes.

Q. You've seen it?

A. Yes.

Q. Okay. Are there any safeguards in wiring out amounts of money that are above a certain level? In other words, any special safeguards for transfers over $20,000.

A. The wire room will consult the business resource center on wire requests that come through the business online banking channel in excess of $100,000.

Q. Okay. So if it's less than $100,000, the business resource center, your department, will not be contacted?

A. That's correct.

Q. And is there any procedure or other safeguard if the money is being wired to an institution that has not had money wired before by

this customer?

A. No.

Q. Would there be any safeguard in place at Citizens that would inquire further into this wire transaction before the money's actually sent?

A. No.

Q. Okay. Other than the $100,000 procedure that you've testified about already, are there any other characteristics of a wire transfer that would require closer scrutiny?

A. I would think it would be fair to say if the wire -- if the instructions came in and it wasn't a valid ABA number, that would be a situation where we would reach out to the customer.

Q. And the ABA number would be the other bank's number, correct?

A. The receiver ABA.

Q. Right. Any other situation that you're aware of?

A. None that I can think of at this time.

Q. Okay. There is no indication in this case that anyone at Citizens contacted the Shames-Yeakels before this money was wired to the bank in Honolulu, correct?

A. Correct.
Q. Do you know whose handwriting is on this document, Bates 286?
A. I believe that looks like Mr. Prisby, Tom Prisby.
Q. Okay. Do you know whose handwriting is on these two pieces of paper, 294 and 295?
A. 294 is mine. There's a few people on there, and I can tell you who's who.
Q. Let's mark it first --
A. Okay.
Q. -- so you can tell me on the record.
(Document marked as Milne Exhibit No. 11 for identification.)
BY MR. SOUMILAS:
Q. All right, ma'am. You said that within the two pages we've marked as Milne 11, the first page, Bates 294, is your handwriting?
A. Correct.
Q. All of it?
A. Yes.
Q. And what's going on here?
A. I believe that this -- when I originally took the call from Mrs. Yeakel back on

the 23rd of February, this is the piece of paper I happened to have in front of me, because I capture her IP address that she told me over the phone.
Q. Okay. So when you testified earlier that that was one of the questions in the first conversation, this is your handwriting showing the IP address?
A. Yes.
Q. Do you have any reason to believe that this was not her IP address?
MR. BROWN: What time period are you talking about? I object. It calls for speculation and lacks foundation, vague.
BY MR. SOUMILAS:
Q. I'm just asking do you know whether this is her IP address, or do you have any reason to doubt that it is?
MR. BROWN: Same objection.
THE WITNESS: Can I answer the question?
MR. BROWN: If you understand it.
THE WITNESS: Well, my understanding of the question is on the 23rd of February when I asked Mrs. Yeakel over the telephone

"What is your IP address," this is the number that she gave me.
BY MR. SOUMILAS:
Q. Okay. What is the notation on the top right-hand side "2/9," and then some other numbers?
A. This 219 is the area code for Indiana.
Q. Oh.
A. So I don't know for sure, but I'm guessing this may be her phone number to contact her back on Monday.
Q. Okay. What do the rest of your notes say?
A. In the event that she didn't know how to look up her IP address, I was prepared to tell her. But -- so I made some notes on how you do that. But I didn't have to coach her. She looked -- she was doing it on her own, and then she gave me that number.
Q. Okay. So those are the notes about "Dos prompt?"
A. Mm-hmm, and "Type in the IP configure."
Q. That was a yes, right, ma'am?
A. Yes.

Q. And what's in the box, "Start programs?" Is that still part of that protocol?
A. Correct.
Q. Okay. What are your notes underneath?
A. Where it says -- the 213 was the -- what she was explaining to me over the phone, was the date of the transaction, Marsha Yeakel, $26,000, that 51 number, I believe, is the home equity number to her checking. So in other words to the transfer, and then I made a note that from there it was wired out.
Q. What was the 2144.88 that's circled?
A. I don't remember.
Q. Down at the bottom, you have a "Star statement today, Michael." Do you see that?
A. Yes. I believe what the "Statement today" is just me making a note to recall that she received and opened her statement today.
Q. Okay.
A. And I believe the "Michael" piece is she checked with Michael, and he said that wasn't his transaction either.
Q. Okay. What's the next page of Milne 11?

A. This top piece, this $500 deductible, you can tell it looks like a Post-it note and then the back of a Post-it, that's my handwriting.

Q. Okay.

A. And what that is is just capturing a conversation -- I had a telephone conversation with Mrs. Yeakel during the course of events saying that "It was brought to our attention that many homeowners and businesses have insurance that protect against identify theft," and asked if, you know, she perhaps had that kind of insurance, and has she pursued that in any way, and she indicated that she did pursue that with State Farm about a month ago, and she said that it wasn't applicable in this case, and that she had a $500 deductible on her homeowners.

Q. Okay. Are those the only notes you've made on Bates 295?

A. Yes.

Q. And do you know whose notes are the other notes?

A. The -- on the left-hand-side, this "Marsha, Tuesday, February 13th, '07," these notes are a colleague in my department, Debbie Powell.

Q. Okay.

A. And really what this is is a reiteration of what we saw in the reports, as far as the time and what happened, what type of transaction was captured within the e-Corp.

Q. And does that show that this transaction went down between 12:40 p.m. on the 13th and 12:59 on that same day?

A. That's what it looks like. And then on 13:23 she logged off.

Q. Okay. And do you know whose notes are on the right-hand side?

A. Sure. Another colleague in my department, Jon, J-o-n, Schiesser, S-c-h-i-e-s-s-e-r.

Q. And who is that?

A. Another person in our business resource center.

Q. And did that person have anything to do with your investigation?

A. Jon contacted, on my behalf, Nicole Pao. Again, we were waiting for them to respond for the return of that wire, not hearing anything, us trying to be proactive, "Did you get it? Are you

going to send it back? What are you doing?" Her response, Nicole's response to Jon, was "We're attempting to contact our customer, and the bank in Hawaii is requiring authorization from the customer in order to send back the wire." These were, like, little pieces of paper that were in the file, so I just copied them on one.

Q. Got it. And Nicole Pao was somebody in Hawaii?

A. Well, Nicole Pao was the person that I had been talking to all along when I called that general number. She's the gal in the call center.

Q. Got it. Would you please take a look at this next document, and let me know whether you recognize this. It's 173, and the next Page 174. Do you know what this is?

A. I believe this is the report that I picked up from Lake County Sheriff, the police report that she filed, Mrs. Yeakel filed.

Q. In that format, that's how you picked it up?

A. I don't recall the format, but I'm -- I'm able to determine that's what it is based on what it says here.

Q. Okay. Why don't I take those pages back. Do you know whether the Yeakels filed any other -- or made any other reports with any other police department, other than Lake County?

A. I believe that Mrs. Yeakel indicated that she was reaching out to the Honolulu Police Department. She told me that verbally, and she also said she wasn't getting anywhere.

Q. Ms. Milne, have we gone over your participation in this dispute initiated by the Yeakels about the transfer of money from your bank to Hawaii?

A. Yes.

Q. We've covered all the parts that you were involved in personally?

A. Yes.

Q. I don't have any further questions, then.

A. Super.

MR. BROWN: Nothing here. We'll reserve signature.

MR. SOUMILAS: Okay. Well, we are all done, ma'am. Thank you very much for your patience.

AND FURTHER DEPONENT SAITH NAUGHT...

STATE OF ILLINOIS )
) SS.
COUNTY OF C O O K )

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DISTRICT

MARSHA L. SHAMES-YEAKEL AND MICHAEL W. SHAMES-YEAKEL, Plaintiffs,

vs

CITIZENS FINANCIAL BANK, Defendant.

) Civil Case No. 07-5387

I hereby certify that I have read the foregoing transcript of my deposition given on May 13, 2008, at the time and place aforesaid, consisting of Pages 1 through 113, inclusive, and I do again subscribe and make an oath that the same is a true, correct and complete transcript of my deposition so given as aforesaid.

please check one:

_____ I have submitted errata sheet(s)
_____ No corrections were noted

______________________________
DEBORAH MILNE

SUBSCRIBED AND SWORN TO before me this ____ day of _______, A.D., 2008.

______________________________
Notary Public

I wish to make the following changes for the following reasons:

| Page | Line | |
|---|---|---|
| ____ | ____ | Change: ____________ Reason: ____________ |
| ____ | ____ | Change: ____________ Reason: ____________ |
| ____ | ____ | Change: ____________ Reason: ____________ |
| ____ | ____ | Change: ____________ Reason: ____________ |
| ____ | ____ | Change: ____________ Reason: ____________ |
| ____ | ____ | Change: ____________ Reason: ____________ |
| ____ | ____ | Change: ____________ Reason: ____________ |
| ____ | ____ | Change: ____________ Reason: ____________ |
| ____ | ____ | Change: ____________ Reason: ____________ |
| ____ | ____ | Change: ____________ Reason: ____________ |
| ____ | ____ | Change: ____________ Reason: ____________ |
| ____ | ____ | Change: ____________ Reason: ____________ |
| ____ | ____ | Change: ____________ Reason: ____________ |
| ____ | ____ | Change: ____________ Reason: ____________ |
| ____ | ____ | Change: ____________ Reason: ____________ |

(Signed) ______________________

STATE OF ILLINOIS )
) SS:
COUNTY OF COOK )

I, Rebecca A. Graziano, Certified Shorthand Reporter in and for the County of Cook, State of Illinois, do hereby certify that on the 13th of May, A.D., 2008, the deposition of the witness, DEBORAH MILNE, called by the Plaintiff, was taken before me, reported stenographically and was thereafter reduced to typewriting through computer-aided transcription.

The said witness, DEBORAH MILNE, was first duly sworn to tell the truth, the whole truth, and nothing but the truth, and was then examined upon oral interrogatories.

I further certify that the foregoing is a true, accurate and complete record of the questions asked of and answers made by the said witness, at the time and place hereinabove referred to.

The signature of the witness was reserved by agreement.

The undersigned is not interested in the within case, nor of kin or counsel to any of

the parties.

Witness my official signature on this 13th day of May, A.D., 2008.

Rebecca A. Graziano, CSR
29 South LaSalle Street Suite 850
Chicago, Illinois 60603

License No. 084-004659