IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SHAMES-YEAKEL, et al., )
)
              Plaintiffs, )
)
v. )    Case No. 07-5387
)
CITIZENS FINANCIAL BANK, )    Judge Pallmeyer
)
             Defendant. )

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Citizens Financial Bank ("Citizens"), through counsel, provides the following points and authorities that support its motion for summary judgment against plaintiffs Michael and Marsha Shames-Yeakel (the "Plaintiffs").

### PLAINTIFFS' CLAIMS

In their Amended Complaint (Dkt. 7), Plaintiffs have brought six claims against Citizens arising out of disputed transfers of funds between and out of Plaintiffs' bank accounts. The claims fall under the headings of (1) the Truth in Lending Act ("TILA"), (2) the Electronic Funds Transfer Act ("EFTA"), (3) the Fair Credit Reporting Act ("FCRA"), (4) the Indiana Uniform Consumer Credit Code ("IUCCC"), (5) Negligence, and (6) Breach of Contract.

### CITIZENS' MOTION FOR SUMMARY JUDGMENT

Citizens moves for summary judgment on each of the Plaintiffs' claims, as the evidence shows Plaintiffs cannot prove the elements required for the claims on which they must carry the burden of proof. Because there are no genuine issues of material fact relating to the various claims, Citizens is entitled to judgment as a matter of law, and the case should be dismissed.

### LEGAL STANDARD

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, presents no genuine issue of material fact, so that the movant is entitled to judgment as a matter of law. *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005). To defeat Citizens' motion for summary judgment, the Plaintiffs, as the nonmoving parties must

identify sufficient evidence to sustain each element of the case they must prove at trial. *Boumehdi v. Plastag Holdings*, LLC, 489 F.3d 781, 787 (7th Cir.2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548 (1986)). Similarly stated, Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof. See *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247 (1986).

ARGUMENT

I.

THE TILA AND EFTA CLAIMS FAIL BECAUSE THE PLAINTIFFS' ACCOUNTS ARE NOT CONSUMER ACCOUNTS AND ARE OUTSIDE THE SCOPE OF THE ACTS.

Plaintiffs' claims under the Truth in Lending Act and the Electronic Funds Transfer Act share a common element – they allege that Citizens violated laws that would protect the Plaintiffs as consumers. But the problem with these claims is that the Plaintiffs are *commercial* account holders, not *consumers*. Funds from their line of credit were used primarily for business purposes. ¶ 7-8.[1] And the wire transfer to Hawaii came out of Best Practices's business checking account. ¶ 21. The threshold question that must be answered in the affirmative for Plaintiffs' claims to survive summary judgment is "Are the Plaintiffs consumers as defined by the TILA and EFTA?" Because the answer to this question is "no," these claims against Citizens fail as a matter of law.

**A. The TILA does not govern Plaintiffs' accounts**

1. The TILA's scope

The Truth in Lending Act applies only to "consumer" credit transactions, which the statute defines as transactions in which "the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1602(h); 12 C.F.R. § 226.2(a). At the same time, the TILA explicitly provides that it does not cover "[c]redit transactions involving extensions of credit primarily for business, commercial, or

---

[1] All "¶" are references to the paragraphs of Citizens LR 56.1 Statement of Facts.

agricultural purposes." 15 U.S.C. § 1603(1). Asset accounts, such as a business banking account, are clearly excluded under the plain language of the statute.

To determine whether the purpose for the extension of credit was consumer- or business-related, and thus whether the TILA applies to it, a court should examine the transaction as a whole and take into account the entire surrounding factual circumstances. *Bokros v. Associates Finance, Inc.*, 607 F.Supp. 869, 871 (N.D. Ill. 1984); *Gombosi v. Carteret Mortgage Corp.*, 894 F.Supp.176, 180 (E.D. Pa. 1995).

The Plaintiffs bear the burden of showing that the disputed transactions are consumer credit transactions and not business transactions. *Gombosi*, 894 F.Supp. at 180; *Quinn v. A.I. Credit Corp.*, 615 F.Supp. 151, 153 (E.D. Pa. 1985) ("[T]o qualify for the [TILA's] protection, *plaintiff* must show that the disputed transaction was 'a consumer credit transaction, not a business transaction.'") (emphasis added), citing *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 751 (3d Cir. 1974).

Where credit is extended for both personal and business reasons, the mere fact that the transaction has some personal purpose does not automatically render it subject to the provisions of the TILA. *Gombosi*, 894 F.Supp. at 180, citing *Quinn*, 615 F.Supp. at 154 (E.D. Pa. 1985). In fact, circumstances may exist where the majority of a loan's proceeds are used for personal/consumer purposes, yet the TILA will not apply. See, e.g., *Stillman v. First. Nat. Bank of North Idaho*, 791 P.2d 23, 25 (Ct. App. Idaho 1990) (the TILA did not apply even though more than half of the proceeds of a loan were put to personal use). Where more than half of the proceeds are used for business purposes, the transaction will be exempt from the requirements of the TILA. *Bokros*, 607 F.Supp. at 871, *Cashmere Valley Bank v. Brender*, 146 P.3d 928, 930 (Wash. 2006).

2. The TILA does not apply to the Plaintiffs' line of credit

Citizens is not bound by the TILA in relation to the Plaintiffs' claims because the extension of credit at issue – the line of credit – was not for consumer purposes but was primarily for business and commercial purposes. Looking at the entire circumstances as a whole, the record demonstrates this commercial nature of the line of credit in at least three ways. First, the proceeds on the line of credit were used primarily to make business purchases. ¶ 7-8. Second, pursuant to instructions given by the Plaintiffs, the line of credit was "linked" to the business

checking account through the business online banking system. ¶ 9. The Office of Thrift Supervision – the government agency charged with regulation and enforcement concerning federally insured savings institutions such as Citizens – agreed in its investigation that the line of credit should be treated as a commercial account and thus outside the scope of the TILA. ¶ 41-43.

*(i) The proceeds from the line of credit were used primarily for business purposes*

In her deposition, Ms. Shames Yeakel testified as to four advances the Plaintiffs ordered on their line of credit with Citizens. ¶ 7. Three out of these four advances were for business purposes. *Id.* With the money advanced on the line of credit, the Plaintiffs made an "investment" in Chicago real estate, bought cars that both Plaintiffs use for Best Practices's business purposes, and put a roof on the house – the very building that contains Best Practices's offices. *Id.* Only one of these purchases can properly be characterized as purely "personal" in nature – the purchase of an automobile for their daughter. *Id.* More than half of the advances on the line of credit were to advance interests of Best Practices. Such use of the funds clearly show a business or commercial purpose.

Ms. Shames-Yeakel's characterization of the purchase of Chicago real estate as an "investment" reveals the commercial or business purpose for the use of those funds. The case of *Simpson v. Aetna Finance Company*, 523 N.E.2d 762 (Ind. Ct. App. 1988) is instructive. In *Simpson*, the court held that use of loan proceeds for an "investment" "indicate[d] that the loan was not made for family but for business purposes." 523 N.E.2d at 764. Because of the business purpose of this "investment," federal and state consumer disclosure statutes did not apply. *Id*. See also *Anderson v. Rocky Mountain Federal Sav. & Loan Ass'n.*, 651 P.2d 269, 273 (Wyo. 1982) (purchase of mobile home for resale was not "primarily for a personal, family, household or agricultural purpose"); *Hensley v. Lubbock Nat. Bank*, 561 S.W.2d 885 (Tx. Ct. App. 1978) (purchase of automobiles for friend using proceeds from credit transaction was not a "consumer" transaction and thus not subject to federal consumer protection statute).

Plaintiffs appear to emphasize that their line of credit is "backed by the equity in their personal residence," as if to argue that this fact determines the line of credit to be for consumer and not commercial purposes. Dkt. 7, ¶7. But courts faced with similar situations have been virtually unanimous in finding that the mere fact that a loan is secured by the family home does

4

6366731v1 63070

not itself bring the transaction under the TILA. See, e.g., *Sherrill v. Verde Capital Corp.*, 719 F.2d 364, 367 (5th Cir.1983) (TILA inapplicable to loan, secured by plaintiff's home, intended to raise working capital for individual's business raising horses); *Poe v. First Nat'l Bank of DeKalb County*, 597 F.2d 895, 896 (5th Cir. 1979) (TILA inapplicable to business loan secured by husband and wife's personal property); *Gombosi*, 894 F.Supp. at 180 (refinanced mortgage not subject to TILA because proceeds went primarily to individually-owned business); *Bokros*, 607 F.Supp. 869 (loan secured by junior mortgage on house not within scope of TILA where slightly more than half of proceeds were used to buy tractor for debtor's business); *In re DiPietro*, 135 B.R. 773 (Bankr. E. D. Pa.1992) (TILA inapplicable to loan that was secured by personal home but used to finance tailor shop). Rather, the purpose for which the credit was obtained – not the nature of the collateral used to get it – is the focus of the TILA exemption inquiry. See *Sherrill*, 719 F.2d at 367 ("[T]he purpose of the transaction or extension of credit is controlling, and not the property on which a security interest is retained.").

> *(ii) "Linking" the line of credit and business banking accounts through business online banking rendered the line of credit a business account and outside the scope of TILA.*

By setting up their business online banking to "link" the line of credit account with the business checking account, the Plaintiffs took further steps to bring the line of credit into the realm of a business account which is not within the scope of the TILA. This was the opinion of the Office of Thrift Supervision, which found that "the home equity line of credit was used as a business purpose account, as opposed to being for personal, family or household purposes." ¶ 42. And such a conclusion is reasonably drawn from looking at the whole set of circumstances, which is required in a determination of whether a loan is of a consumer or business nature. *Bokros*, 607 F.Supp. at 871.

The Plaintiffs benefited from having the line of credit account linked to the business banking account. The Plaintiffs entered into a linking agreement knowing that these benefits would occur. Now, however, the Plaintiffs wish to repudiate the linking when it apparently no longer works to its advantage. The Plaintiffs should be estopped from making this argument. *In re Reliable Mfg. Corp.*, 17 B.R. 899, 904 (N.D. Ill. 1981) (Party may not endorse a transaction at the time it is entered into only to repudiate it before [the] court because the transaction no longer serves its interest).

## B. The EFTA does not govern the Plaintiffs' accounts

Plaintiffs' claims under the EFTA all deal with the manner in which Citizens handled Plaintiffs' "account." See Dkt. 7, ¶42. Plaintiffs' claim that Citizens violated the EFTA presumably centers around the electronic transfer of funds out of the Best Practices business checking account. One should not presume that Plaintiffs' EFTA claims center on the line of credit, because the term "account" under the EFTA includes only "demand deposit, savings deposit, or other asset account[s]." 15 U.S.C. §1693a(2). Under this language, the EFTA clearly does not purport to cover lines of credit. So one is left to analyze whether the transfer of funds out of the business checking account gives rise to a violation of the EFTA.

The EFTA addresses and governs "electronic fund transfers." This term is defined under the EFTA as "any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an *account*." 15 U.S.C. § 1693a(6) (emphasis added).

Pursuant to its rulemaking authority under the EFTA, § 1693b, the Federal Reserve Board promulgated a set of regulations codified at 12 C.F.R. part 205, popularly known as "Regulation E," including a specific section that defines account as "a demand deposit (checking), savings, or other consumer asset account ... held either directly or indirectly by a financial institution and established primarily for personal, family, or household purposes." 12 C.F.R. § 205.3(b). So the business checking account falls outside of the scope of the EFTA for the same reason the line of credit falls outside of the TILA – the EFTA deals with accounts that are "established primarily for personal, family, or household purposes." The language used to define the scope of what is covered under the EFTA is identical to the scope of the TILA inasmuch as both deal with accounts that are used "primarily for personal, family, or household purposes." Thus the authority under the TILA supporting the non-applicability of the statute is equally relevant under the EFTA. See *Cobb v. Monarch Finance Corp.*, 913 F.Supp. 1164 (N.D.Ill. 1995)(an EFTA case using the "analogous" TILA standard to distinguish between "consumer" and "commercial" transactions.)

6366731v1 63070

There is no dispute that the Best Practices business checking account was established for the purposes that bear its name, i.e., business purposes. Ms. Shames-Yeakel testified to the types of expenses the company occurs, like auto expenses for commuting to clients' offices, computer expenses, Internet access and cell phone service. ¶ 2. And the only banking accounts the company has ever had are the current business checking account the company has and the business checking account that is the subject of this lawsuit. ¶ 3.

It is worth noting that the Office of Thrift Supervision made the finding that the EFTA (and Regulation E promulgated thereunder) does not govern the transfer of funds out of the business checking account which forms the basis of this dispute. ¶ 42-43. Simply stated, because the account at issue in Plaintiffs' EFTA claim was a business account, and not one used "primarily for personal, family, or household purposes," the EFTA does not apply. Accordingly, the claim fails as a matter of law and summary judgment should be entered.

II.

NO EVIDENCE SUPPORTS THE PLAINTIFFS' CLAIMS UNDER THE FCRA

After the Plaintiffs defaulted on their line of credit, Citizens reported the delinquencies to the major credit reporting agencies. ¶ 35. Thereafter, the Plaintiffs disputed the information which Citizens had provided. *Id*. Plaintiffs claim that Citizens violated the FCRA by willfully and negligently failing to do a number of things after the Plaintiffs disputed the information. Dkt. 7, ¶46. But summary judgment should be granted on the FCRA claim because there is no evidence in the record to support Plaintiffs' allegations that Citizens failed to abide by the requirements of the FCRA. In fact, the evidence points to the contrary.

The FCRA imposes certain requirements on entities that furnish information to credit reporting agencies. 15 U.S.C. § 1681s. When a consumer reporting agency notifies a furnisher of information of a dispute with regard to an account, the furnisher of information must: (1) conduct an investigation with respect to the disputed information; (2) review all relevant information provided to it by the consumer reporting agency; (3) report the results of the investigation to the agency; and (4) if the information is found to be inaccurate or incomplete, report the results to all consumer reporting agencies to which it originally provided the erroneous information. 15 U.S.C. § 1681s-2(b); *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005).

Citizens conducted a reasonable investigation concerning the dispute raised by the Plaintiffs concerning the delinquent line of credit payments, reviewed all information provided to

it, and maintained clear communication with the reporting agencies. Because the comprehensive investigation Citizens undertook revealed no inaccurate or incomplete information, there was no need to report any additional information subsequent to the investigation.

### A. Citizens' investigation of disputed credit information was reasonable

The first allegation which Plaintiffs make against Citizens under the FCRA is that Citizens "willfully and negligently fail[ed] to conduct an investigation of" information concerning Plaintiffs' overdue payment on their line of credit. Dkt. 7, ¶46(a). The FCRA requires any furnisher of information to a consumer reporting agency, upon receiving notice from the reporting agency that the information has been disputed, to "conduct an investigation with respect to the disputed information." 15 U.S.C. §1681s-2(b)(1)(A). Courts have required that this investigation be "reasonable." *Westra*, 409 F.3d at 827. Summary judgment on this question is proper if the reasonableness of the Citizens' procedures is beyond question. *Id*.

In *Westra*, the Seventh Circuit held that a furnisher of information to a reporting agency was entitled to summary judgment because its investigation was reasonable. Indeed, the *Westra* case sets the standard for "reasonableness" quite low. The furnisher's investigation was comprised merely of verifying the name, address, and date of birth of an account holder and sending that information back to credit reporting agency. Rejecting the plaintiff's argument that the furnisher of information should have contacted the account holder directly in its investigation, the court held that that "would be terribly inefficient and such action is not mandated by the FCRA." *Id*.

Citizens' investigation into the disputed information, when examined in the framework of what is mandated by the FCRA (and as instructed by the Seventh Circuit in *Westra*), was clearly reasonable. Indeed, Citizens exceeded what the FCRA requires. In order to investigate the disputed information, i.e., whether the Plaintiffs' account was delinquent, Citizens needed only review its own records to see that a balance was due. Such a balance was due, as Citizens had concluded that the Plaintiffs were responsible for absorbing the purported loss of $26,500. ¶ 36.

But Citizens did even more than merely look at its records to see that the Plaintiffs' account was listed as delinquent (which is all that *Westra* would require). Citizens looked to the comprehensive investigation into the entire dispute lodged by the Plaintiffs, going back to the alleged unauthorized transfers, contacting other banks, following up with correspondence, doing

independent research on the Internet to try and figure out where the funds might have gone, calling phone numbers in hopes of tracking down the funds, and making special trips to the local police department. ¶ 37. To say that Citizens' investigation was reasonable is an understatement. For purposes of this motion for summary judgment, the reasonableness is beyond question. *Westra*, 409 F.3d at 827.

B. **No evidence supports the Plaintiffs' claim that Citizens failed to review all relevant information concerning Plaintiffs' account and report that information back to the credit reporting agencies.**

Plaintiffs assert that Citizens did not adequately review information provided to it by the credit reporting agencies after the Plaintiffs' disputed the delinquency on the line of credit with the credit reporting agencies. Dkt. 7, ¶46(b), (c). Plaintiffs have simply provided no evidence to support this contention. In fact, the record as developed through the deposition of Citizens Senior Vice President of Asset Management, Jeffrey Stur, shows that the review of the information was pursuant to established bank protocol, and was thorough. Nothing indicates any deficiency. ¶¶ 37-40.

Only the Plaintiffs' allegations suggest any lack of reasonableness in the investigation. But those mere allegations are not sufficient to survive summary judgment. As the nonmoving party for summary judgment, the Plaintiffs have an affirmative duty to come forth with evidence sufficient to establish the elements of their claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). Because there is no evidence to support the Plaintiffs' claim that Citizens did not perform a reasonable review of the information provided by the credit reporting agencies, summary judgment is appropriate. *Id*.

C. **Plaintiffs' claim that Citizens failed to properly provide information to credit reporting agencies fails as a matter of law, because the FCRA does not require such information be provided, and there was no incompleteness or accuracy.**

In Paragraph 46(d) and (e) of the Amended Complaint (Dkt. 7), Plaintiffs claim that Citizens violated the FCRA by "willfully and negligently failing to provide any and all credit reporting agencies with the factual information and evidence that Plaintiffs submitted to [Citizens], and which proved that the information concerning the Plaintiffs' credit reports was

9

inaccurate[.]" This aspect of the claim fails simply because it seeks to impose requirements not found in the FCRA. No such obligation exists under 15 U.S.C. § 1681s-2(b).

Moreover, the information which Citizens uncovered in its investigation – even had it been required to forward it – did not show the credit report was inaccurate. ¶ 40. To the contrary, the information was confirmed as accurate, because the delinquency on the line of credit was reflected in Citizens' records. ¶ 36. Any obligation to forward information to the credit reporting agencies would have arisen had Citizens determined that information contained in the credit report was incomplete or inaccurate. 15 U.S.C. § 1681s-2(b)(1)(D). But there was no such incompleteness or inaccuracy – the debt was due. Similarly, any allegations that Citizens "continued to furnish and disseminate inaccurate and derogatory [information]" is unsupported by the record.

III.

PLAINTIFFS' CLAIM UNDER THE INDIANA UNIFORM CONSUMER CREDIT CODE FAILS BECAUSE THE STATUTE IS PREEMPTED BY FEDERAL LAW.

Count Four in Plaintiffs' Amended Complaint (Dkt. 7, ¶49) seeks relief under Chapter 3 of Indiana's Uniform Consumer Credit Code ("IUCCC"). This claim fails as a matter of law and should be dismissed on summary judgment because the IUCCC is expressly preempted by federal law.

The Office of Thrift Supervision has promulgated 12 CFR §560.2, which provides, in relevant part, as follows:

> OTS is authorized to promulgate regulations that preempt state laws affecting the operations of federal savings associations when deemed appropriate to facilitate the safe and sound operation of federal savings associations, to enable federal savings associations to conduct their operations in accordance with the best practices of thrift institutions in the United States, or to further other purposes of the HOLA. To enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden), OTS hereby occupies the entire field of lending regulation for federal savings associations. OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, federal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) of this section or

§560.110 of this part. For purposes of this section, "state law" includes any state statute, regulation, ruling, order or judicial decision. (Emphasis added).

Citizens is a federal savings institution. Accordingly, it may extend credit without regard to state laws such as the IUCCC, so summary judgment on a claim brought under that statute is appropriate. See *Haehl v. Washington Mut. Bank, F.A.*, 277 F.Supp.2d 933, 940 (S.D. Ind. 2003) (Dismissing IUCCC claim as preempted, holding that "[s]ection 560.2 preempts state laws that more than incidentally affect lending operations.").

Even if the IUCCC claim were not preempted by federal law, the claim would fail in this case because the IUCCC applies only to "consumer loans." IC 24-4.5-3-102. A "consumer loan" is a loan for which, among other things, "the debt is primarily for a personal, family, or household purpose." IC 24-4.5-3-104(b). Plaintiffs' allegations refer to "finance charges" and "delinquency charges," neither of which applied to Plaintiffs' business checking account, so one must presume that Plaintiffs intend the IUCCC claim to pertain to the Plaintiffs' line of credit.

As shown above in the sections dealing with the TILA and the EFTA, the line of credit was used primarily for the Plaintiffs' business needs. For this reason, the IUCCC does not apply to the account at issue. Other parts of the IUCCC set forth the inapplicability as well. See, e.g., IC 24-4.5-1-202 ("This article does not apply to (6) A loan in which the debt is incurred primarily for a purpose other than a personal, family, or household purpose [or] (7) An extension of credit primarily for a business, a commercial, or an agricultural purpose. . . .").

IV.

PLAINTIFFS HAVE PRESENTED NO EVIDENCE OF ANY BREACH OF A DUTY BY CITIZENS, NOR HAVE THEY SHOWN ANY CAUSAL LINK BETWEEN A BREACH AND THE DAMAGES ALLEGEDLY SUFFERED.

Plaintiffs' negligence claim can be summarized by saying Citizens is accused of improper conduct in connection with (1) permitting the disputed transfers to occur, (2) investigating what happened, and (3) handling the overdue amounts on the line of credit, including furnishing information to the credit reporting agencies and investigating the Plaintiffs' credit dispute.[2] Dkt. 7, ¶52.

---

[2] One of Plaintiffs' allegations is that Citizens was negligent in permitting the home equity line of credit of $30,000 to be overdrawn by one of the unauthorized transfers. *Amended Complaint* ¶52(g). Plaintiffs

To succeed in an action for negligence, a plaintiff must prove facts that establish the existence of a duty, a breach of the duty, and an injury to the plaintiff which was proximately caused by the breach. *Hills v. Bridgeview Little League Ass'n.*, 745 N.E.2d 1166, 1178 (Ill. 2000).

Plaintiffs have come forward with no evidence to support their claim that Citizens has been negligent in any way. Moreover, the evidence provided by the Plaintiffs does nothing to establish any causal link between any conduct of Citizens – whether in connection with the alleged unauthorized transfers, the subsequent investigation, or furnishing of information to the credit reporting agencies – and the damages alleged. What caused the alleged damage to the Plaintiffs was the transfer of funds by an unknown party. The conduct of Citizens, which at all times has been vigilant, thorough and attentive, is not the cause. And Plaintiffs can point to no evidence to say that it is the cause. Where the Plaintiffs cannot show conduct by Citizens amounting to a breach – let alone a connection to any damages – summary judgment is appropriate. See *Jones v. Commerce Bank, N.A.*, No. 06-835, 2007 WL 672091, at *3-4 (S.D.N.Y. March 6, 2007) (Summary judgment granted against plaintiff's claim that her bank negligently allowed an identity theft to occur and negligently investigated the claim of identity theft).

The lack of evidence on the elements of breach and causation is sufficient for the court to award summary judgment. But the appropriateness of summary judgment on the claim is bolstered by the affirmative evidence showing the reasonableness of the bank's conduct. For one, the bank employed reasonable security measures to ensure disputed transfers like the one alleged in this case did not occur. Citizens' retained expert states that "[a]fter reviewing the security controls implements by Fiserv and [Citizens], I believe that they were reasonable and not the cause of the unauthorized transfer." ¶ 19. The investigation done by Citizens after being notified of the disputed transfers was, in the words of another expert, "reasonable and conducted properly." ¶ 33.

Finally, inasmuch as the Plaintiffs' negligence claims are based on the reporting of information to the credit reporting agencies, Citizens is entitled to immunity under the FCRA. Section 1681h(e) provides that "no consumer may bring any action or proceeding in the nature of

---

have conceded in deposition testimony that their line of credit was $50,000, not $30,000. *Marsha Dep.* 27:13-15. The account was not overdrawn. Accordingly, Citizens expects Plaintiffs will not dispute that summary judgment on this aspect of the claim is not subject to reasonable objection.

defamation, invasion of privacy, or *negligence* with respect to the reporting of information against . . . any person who furnishes information to a consumer reporting agency, based on information disclosed [to the consumer], . . . except as to false information furnished with malice or willful intent to injure such consumer." 15 U.S.C. §1681h(e). There is simply no evidence that Citizens acted with malice or willful intent in this regard.

IV.

THE PLAINTIFFS' BREACH OF CONTRACT CLAIM FAILS AS A MATTER OF LAW

The Plaintiffs' allege breach of the Line of Credit Agreement with Citizens. Dkt. 7, ¶56. The Agreement contains a choice of law provision requiring it to "be governed and construed in accordance with the laws of the state in which the property securing [the] loan is located." ¶ 6. The loan is secured by the Plaintiffs' house, which is located in Indiana. *Amended Complaint* ¶¶ 4, 7. So the present analysis must look to Indiana law.

To establish a breach of contract under Indiana law, the Plaintiffs have the burden of proving the existence of a contract, breach thereof, and damages. *Rice v. Hulsey*, 829 N.E.2d 87, 89 (Ind. App. 2005). Parties may effectively limit their exposure for breach of contract, however, through limitation of liability clauses in an agreement. See *Carr v. Hoosier Photo Supplies, Inc.*, 441 N.E.2d 450 (Ind. 1982). Construction of a written contract is a question of law for the court, with summary judgment being particularly appropriate. *Ancich v. Mobil Oil Corp*. 422 N.E.2d 1320, 1321 (Ind. App. 1981).

In this case, summary judgment should be granted on the Plaintiffs' breach of contract claim for two reasons. First, the agreement which is alleged to have been breached does not contain any promise by Citizens which the Plaintiffs now claim has not been fulfilled, so the first element of breach of contract cannot be established. Second, provisions in the Internet Banking Agreement which the Plaintiffs and Citizens entered into, limit Citizens' liability for the disputed transfers which form the basis of this action.

**A. <u>The agreement contains no promises which Citizens is accused of breaking</u>**

The Plaintiffs assert that Citizens breached its agreement with the Plaintiffs in three ways: by allowing the disputed transfers to occur, by allowing a transfer which overdrew the

13

Plaintiffs' line of credit[3], and by demanding payment for the amount that had been advanced on the line of credit in the disputed transfer. Dkt. 7, ¶56.

The Plaintiffs are trying to interject terms into the line of credit agreement which are not expressed there. Allegations that Citizens "allowed" the disputed electronic transfers to occur presupposes there was some promise in the line of credit agreement to "prohibit" those transactions from happening. But the line of credit agreement contains no such promise. Quite simply, then, Citizens cannot have broken any promise it did not make. Similarly, the Plaintiffs argue that Citizens is in breach by "demanding" that payment be made on the line of credit, as if there were some promise not to demand payment for amounts showing as due on the loan. The contrary is true – the line of credit agreement contains a promise to repay made by the Plaintiffs. So Citizens was well within its rights to demand payment. By doing so it was certainly not in breach.

### B. Liability of Citizens for the disputed transfers is precluded by terms of the Internet Banking Agreement

By using Citizens' business online banking services to access their accounts, the Plaintiffs agreed to be bound by the terms and conditions of the "Citizens Business Online Banking / Internet Banking Agreement." ¶ 16. The Plaintiffs' assent to the terms of this Internet Banking Agreement is indicated in at two ways. First, when the Plaintiffs signed up for business online banking, they acknowledged agreement with the online terms. The language immediately above the signature block of the application the Plaintiffs signed to be enrolled in business online banking contains a specific reference to the online agreement. ¶ 12. The second way in which the Plaintiffs indicated their assent to the terms was simply by using Citizens' business online banking services. ¶ 16.

The Internet Banking Agreement contains language by which the Plaintiffs agreed to limit Citizens' liability for disputed transfers made using either of the Plaintiffs' passwords. Specifically, the Internet Banking Agreement provided the following relating to Citizens:

> We will have no liability to you for any unauthorized payment or transfer including wire transfer made using your password that occurs before you have

---

[3] See footnote 2, supra., for an explanation as to the undisputed evidence on the question of overdrawing on the line of credit.

notified us of possible unauthorized use and we have had a reasonable opportunity to act on that notice.

The disputed transfers were made using Ms. Shames-Yeakel's password. ¶ 20. The disputed transfers were made ten days before the Plaintiffs first notified the bank of possible unauthorized use. Dkt. 7, ¶¶9, 11. These circumstances trigger the limitation of liability. It should be noted that the Plaintiffs are not arguing that the Internet Banking Agreement should not be enforced, as they have not filed an action for rescission or otherwise presented any arguments that they should not be bound by the terms of the Internet Banking Agreement. In the absence of any reason for this limitation of liability provision to not be enforced, summary judgment on the Plaintiffs' breach of contract claim is appropriate.

## CONCLUSION

For all of the reasons stated herein, Citizens respectfully requests the court grant Citizens' motion for summary judgment on all claims brought by the Plaintiffs.

Respectfully submitted,

Timothy A. Hickey  
*thickey@hinshawlaw.com*  
Evan D. Brown  
*ebrown@hinshawlaw.com*  
HINSHAW & CULBERTSON LLP  
222 N. LaSalle, Suite 300  
Chicago, IL 60601

CITIZENS FINANCIAL BANK

By: /s/Evan D. Brown  
One of Its Attorneys

6366731v1 63070

**CERTIFICATE OF SERVICE**

I certify that pursuant to Local Rule 5.5, service of the foregoing MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT was accomplished upon all Filing Users pursuant to the Court's Electronic Case Filing system on September 30, 2008.

/s/ Evan D. Brown