**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DISTRICT**

| | |
|---|---|
| **MARSHA L. SHAMES-YEAKEL** ) | |
| **AND MICHAEL W. SHAMES-YEAKEL** ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Case No. 07-5387** |
| ) | |
| **CITIZENS FINANCIAL BANK** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This is a consumer protection action brought by a husband and wife against their bank because the bank: (1) allowed Plaintiffs' home equity account to be robbed online of $26,500 by an identity thief; (2) mishandled and ignored Plaintiffs' repeated disputes and requests for help; (3) marred their excellent credit; and (4) threatened to take their home via foreclosure if they did not pay for the loss, including interest thereon. Even after Plaintiffs fully cooperated with the bank's investigation, filed a police report and other reports with the authorities, and turned over their personal computers to the bank to show that they had nothing to do with the fraudulent online transaction, the bank refused to stop its demands for payment.

*To this day*, the bank demands payment from Plaintiffs under threat of foreclosure. Plaintiffs -- who were loyal customers of the bank for well over 30 years -- continue to be forced to make monthly payments to the bank on the home equity account, to the tune of thousands of dollars, so that they can avoid having the bank throw them out of their home.

Now the bank moves for summary judgment.[1]  The main thrust of the bank's argument is that Plaintiffs have no case allegedly because their claims and losses are "commercial" and not "consumer" in nature.  The bank so argues even though it acknowledges that Plaintiffs' *home equity* account was the source of the fraudulent online transfer and loss, and was previously used by Plaintiffs for transactions such as buying their daughter a car and fixing the roof of their home.  Moreover, Defendant's motion simply ignores that the bank's own representatives admitted in depositions that the home equity account *originated* as a consumer account and *has always been* treated as a consumer account, not a commercial one.

As will be explained below, none of Defendant's arguments hold water.  Because this case presents genuine issues of material fact, and because Defendant is not entitled to judgment as a matter of law, Defendant's motion for summary judgment must be denied.[2]

## I.    COUNTER-STATEMENT OF FACTS

### A.    The Fraudulent Online Transfer

On February 13, 2007, the bank permitted an entity going by the name "JV Financial" to fraudulently take $26,500 in Plaintiffs' names online from their home equity line of credit account and electronically transfer those funds, through Mrs. Shames-Yeakel's business checking account with Citizens, to a bank in Hawaii.   (Exh. 10, Marsha Shames-Yeakel dep. at 34, 57); (Exh. 4, Stur dep. at 21-23, 40, 78); (Exh. 8, Milne dep. at 38-41).  The funds are

---

[1]    Notably, the bank has no counter-claim for the home equity funds in this case, even though such a counter-claim would be compulsory under Fed. R. Civ. P. 13(a) and could not be pursued in a different action.  For purposes of streamlining this case, Plaintiffs have stipulated to dismiss their claim under the Indiana Consumer Credit Code (Count IV) and their claim for breach of contract (Count VI).  (*See* Stipulation at Docket No. 73).  Thus, the only claims presently before this Court are Plaintiffs' federal consumer protection claims (as set forth at Counts I, II, and III) and their negligence claim (Count V) of their Amended Complaint.  These remaining claims are discussed in detail *infra*.

[2]    As set forth in the Statement of Facts Pursuant to LR 56.1, the principal factual disputes are:  (1) whether Plaintiffs are a business or consumers for purposes of this case; (2) whether Defendant reasonably and properly investigated Plaintiffs' disputes under the legal standards applicable here; and (3) whether Plaintiffs' owe the $26,500 plus interest, as the bank contends.

believed to have been wired to Austria the very next day, and have never been recovered. (Exh. 8, Milne dep. at 39-41); (Def. Fct. Stmt. at ¶21). [3]

The transfer was effectuated completely online from a remote location using a computer "IP address" that did not belong to Plaintiffs. (Exh. 4, Stur. Dep. at 29-30) (IP address for fraudulent transaction began "67.167 . . .") (compare to Exh. 8, Milne dep. at 21-22, 105-07, and Exh. 9) (Plaintiffs' IP address totally different, begging with 19.216. . . .").

Pursuant to the regulatory guidance of the Federal Financial Institutions Examination Counsel ("FFIEC"), the bank was supposed to have implemented a security procedure for online banking referred to as "multifactor authentication" by the end of 2006, but it had not completely rolled out that security procedure by the time of the theft on February 13, 2007. (Exh. 6, Scholl dep. at 35-42). Plaintiffs' online account was not protected via "multifactor authentication," which was intended to assure that only Plaintiffs could access their bank accounts online. (Exh. 6, Scholl dep. at 35-41) (Exh. 8, Milne dep. at 87-90). The bank was also supposed to have provided a "token" to online bank customers as a related security measure by the end of 2006, but it had not gotten around to providing the token to Plaintiffs by the time of the theft. (Exh. 6, Scholl dep. at 35-41) (Exh. 8, Milne dep. at 87-90).

The bank outsources its online banking services to a third party called "Fiserv." (Scholl's expert report, Exh. 8 to Def. Mem.). Defendant's expert, Mark P. Scholl, opined that Fiserv's security controls were adequate even though Mr. Scholl did not investigate or test Fiserv's online

---

[3]     Plaintiffs never heard of or had any dealings with JV Financial, a Hawaii corporation seemingly registered to a private residence in Honolulu in late 2006, and which went delinquent in 2007. (Exh. 10, Marsha Shames-Yeakel dep. at 54-55); (Exh. 4, Stur dep. at 40); (Exh. 11, JV Financial corporation listings). The "owner" of JV Financial, also completely unknown to Plaintiffs, used the name "Jared Allenbrand," and according to the bank's records, he took the money. (Exh. 4, Stur dep. at 40). Defendant does not know of any connection between Plaintiffs and JV Financial or anyone in Hawaii. (Exh. 4, Stur dep. at 40). The bank knew this since Plaintiffs were good and loyal customers for over 30 years. (*See* Answer at ¶¶ 7, 12, 15); (Exh. 12, Drenth dep. at 9-11); (Exh. 3, Prisby dep. at 61). Nevertheless, the bank never gave Plaintiffs any advanced warning prior to the transfer and never reached out to them to confirm the transfer in any way. (Exh. 8, Milne dep. at 103-105).

banking computer system and even though he has a background in marketing, not computer programming or online password encryption. (Exh. 6, Scholl dep. at 13-14, 52-63). Fiserv provides an "Information Security Report" to the bank every month. In February 2007, the month of the theft, Fiserv's report provided that that month had security "vulnerabilities" and "exploits," including a "password stealing program." (Exh. 7). Plaintiffs were never made aware of any such vulnerabilities or exploits.[4]

### B.    Plaintiffs' Disputes

When Plaintiffs learned approximately ten days after the online transaction that the bank had permitted this fraud to take place in their name, they notified the bank immediately. (Exh. 8, Milne dep. at 17-19). Plaintiffs followed the bank's accepted procedures in making several disputes and volunteered to the bank whatever information was asked of them, including their computer's IP address. (Exh. 4, Stur dep. at 16-18); (Exh. 8, Milne dep. at 17-22). They also notified their local police, the Indiana Attorney General's Office, the police in Hawaii, and the Office of Thrift Supervision of this fraud. (Exh. 13) (police report and dispute correspondence); (Exh. 10, Marsha Shames-Yeakel dep. at 55). Later, they also notified and made disputes through the national credit bureaus since the bank reported this fraudulently incurred debt in Plaintiffs' names (and in derogatory status), adversely impacting their otherwise excellent credit standing. (Exh. 4, Stur dep. at 19-20, 72-83).

In every instance, over a period of months, the bank rejected Plaintiffs' disputes and advised them that they were responsible for the loss. (Exh. 4, Stur. dep. at 56-57, 89-90).

---

[4]    Mr. Scholl never even saw the Fiserv report. (Exh. 6, Scholl dep. at 43-44). He did admit, however, that despite security measures he is aware that trojan viruses can steal passwords and cause online identity theft or fraud. (Exh. 6, Scholl dep. at 48-49).

Specifically, the bank acknowledges receiving disputes that fall into four basic categories. First the bank acknowledges accepting and processing an "electronic funds transfer" dispute in February 2003 from Plaintiffs who claimed that they had nothing to do with the transfer of $26,500 and that they should not owe that money. (Exh. 4, Stur dep. at 47-53). According to the bank's other expert, Tim Tedrick, this was the only dispute that the bank actually investigated. (Exh. 5, Tedrick dep. at 7-22). The investigation took place between late February and mid-March 2007. (Exh. 4, Stur dep. at 47-53). The bank concluded that Plaintiffs owed the money. (*See* Exh. 20).

Second, the record also shows that the bank received several "billing disputes" after it began billing the Plaintiffs for the $26,500 loss, plus interest thereon. (Exh. 4, Stur dep. at 53-59). According to Mr. Tedrick, no other investigations were performed. (Exh. 6, Tedrick dep. at 7, 22, 26, 38). But the bank's position remained the same: Plaintiffs owed the money. (Exh. 4, Stur dep. at 56, 88).

Third, the record shows that the bank received a least 19 "credit reporting disputes" after it began reporting the home equity line of credit account in derogatory status to the credit reporting agencies. (Exh. 14) (credit disputes); (Exh. 4, Stur dep. at 59-74, 78-82). Plaintiffs had excellent credit with their other creditors and no other "derogatory" accounts. (Exh. 15) (credit reports). Mr. Tedrick knows of no investigation into those credit disputes. (Exh. 5, Tedrick dep. at 22, 26, 38). The bank always "verified" the accuracy of the account as reported in derogatory status with over $26,500 plus interest owing. (Exh. 14); (Exh. 4, Stur dep. at 71-72, 74, 88).

Fourth, the bank also acknowledges responding to a dispute that Plaintiffs made with the Office of Thrift Supervision ("OTS"). (Exh. 3, Prisby dep. at 57-62, 98-105). Importantly, in

the bank's June 6, 2007 response, the bank's CEO, Thomas Prisby, advised that the Plaintiffs' dispute was "not a consumer dispute," bur rather a "business" transaction, and thus beyond the OTS's jurisdiction.  (Exh. 3,  Prisby dep. 57-62, 98-105).

### C.    The Consumer Nature Of The Home Equity Account And Loss

When testifying in this case, the bank's representatives, including CEO Prisby admitted that, despite what they told the OTS, Plaintiffs' dispute did not stem from a "business" transaction, but rather a consumer one.  (Exh. 3, Prisby dep. at 57-62, 98-105).  Specifically, the bank admitted that the loss comes from Plaintiffs' home equity account.  (Exh. 3, Prisby dep. at 57-62).  The bank understands that the $26,500 passed through Mrs. Shames-Yeakel's business checking account, but the bank has no claim and is making no demand for payment from Mrs. Shames-Yeakel's business, an accounting practice using the name Best Practices which is run out of Plaintiffs' home.  (Exh. 3, Prisby dep. at 58-62).  Indeed, the bank acknowledges that because the home equity account is backed by equity in Plaintiffs' personal residence, they advised Plaintiffs that the residence would be foreclosed upon if they did not pay $26,500 plus interest.  (Exh. 3, Prisby dep. at 60-62).

The home equity account was originated as a "consumer" account, not a business account.  (Exh. 3, Prisby dep. at 59).  It was treated by the bank as a consumer account at all times.  (Exh. 3, Prisby dep. at 58-62).  It was reported to the consumer reporting agencies, not the commercial ones.  (Exh. 3, Prisby dep. at 59-60).  The bank never reported the account to any government regulator as a commercial account.  (Exh. 3, Prisby dep. at 58-62).

At one point, Plaintiffs signed up for "online banking," which would allow them to view information about both their personal and Mrs. Shames-Yeakel's business accounts on the Internet.  (Attachment 4 to Stur Exh. to Def. Mem.).  However, the bank admits that the home

equity account did not turn into a "business" account simply because it would be viewed in the same webpage as any business account. (Exh. 3, Prisby dep. at 98-105); (*see also* Exh. 4, Stur dep. at 101-05, 109-11). The bank knows that Plaintiffs used the home equity account for transactions such as buying a car for their daughter and fixing the roof of their house. (*See* Def. Mem. at 3) (*See also* Exh. 1).

### D. The Bank Intentionally Harms Plaintiffs' Credit And Seeks To Take Their Home Via Foreclosure

Plaintiffs refused to pay the bank for the $26,500 fraudulent transfer, or any interest thereon. (Def. Fct. Stmt. par. 34) (Exh. 4, Stur dep. at 108). Since the $26,500 was drawn from Plaintiffs' home equity line of credit, the bank took the position that it would report this information to the consumer credit bureaus. (Exh. 3, Prisby dep. at 59-60). The bank admits that it reported the account to the consumer, not to the commercial, credit bureaus. (Exh. 3, Prisby dep. at 59-60). The bank also admits that it reported the home equity account in derogatory status (with a late payment history and with $26,500 plus interest owing). (Def. Fct. Stmt. par. 35). This was the only derogatory account on either of Plaintiffs' reports. (Exh. 15, Plaintiffs' credit reports).

In or about June, the bank also decided to foreclose on Plaintiffs' home in order to recover the funds. (Exh. 16). It initiated foreclosure proceedings in August 2007. (Exh. 17). The bank admits that it threatened to foreclose on Plaintiffs' home and sell it at sheriff's sale so that it could recover the $26,500. (*See* Answer at ¶ 27).

Throughout this litigation, and through the present, the bank has demanded payments for these funds from Plaintiffs upon threat of foreclosure. (Exh. 3, Prisby dep. at 61-62). Already Plaintiffs have been forced to make several minimum payments under protest (totaling thousands of dollars) so that they can save their home from foreclosure. (Exh. 18). During his deposition

in March of 2008, Mr. Prisby made it clear that if Plaintiffs stopped making payments, the bank would take whatever action was necessary for it to recover the funds from Plaintiffs, including selling their home at sheriff's sale.  (Exh. 3, Prisby dep. at 61-62).

The bank's conduct in this case has not merely been a series of errors or a result of mere negligence.  (Exh. 4, Stur dep. at 89-90).  When asked at his deposition, Mr. Prisby confirmed that the bank's conduct was "knowing," "deliberate," and "intentional."   (Exh. 3, Prisby dep. at 103-04).

## II.    APPLICABLE STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will only be granted: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In the case at bar, there exist genuine issues of material fact and Defendant is not entitled to judgment as a matter of law.  Summary judgment, therefore, is inappropriate.

## III.    ARGUMENT

### A.    There Exist Genuine Issues Of Material Fact As To Whether Plaintiffs' TILA And FCBA Claims Are Consumer, And Not Commercial, In Nature

Defendant first argues that Plaintiffs are not "consumers" for purposes of their claims under the Truth in Lending Act ("TILA").  (Def. Mem. at 2).  This argument fails because the facts here, including the bank's own admissions, show that Plaintiffs are consumers and that the home equity account was always a consumer account.

### 1. Plaintiffs Properly Bring Consumer Claims Under The TILA And FCBA

Plaintiffs have pled several claims under TILA, 15 U.S.C. §§ 1601 *et seq.*, as well as a distinct section of TILA known as the Fair Credit Billing Act, 15 U.S.C. §§ 1666 *et seq.* ("FCBA"). (*See* Amnd. Compl. at ¶¶ 38-40). These statutes apply to consumers and consumer transactions only, not businesses or business tractions. Consumer transactions are "primarily for personal, family, or household purposes." *See* 15 U.S.C. § 1602(h).[5]

In order to find the primary purpose of a transaction, courts will "examine the transaction as a whole" in light of "the entire surrounding factual circumstances." *Cobb*, 913 F.Supp. 1164, 1174 (N.D. Ill. 1995) (*citing Tower v. Moss*, 625 F.2d 1161, 1166 & n.4 (5th Cir. 1980)) (TILA case). Importantly, the TILA and FCBA are both consumer protection statutes which should be construed liberally in favor of consumers. *See* 15 U.S.C. § 1601(a).[6]

Here, Defendant concedes that the transaction at issue concerns the $26,500 loss in Plaintiffs' home equity account. (Def. Mem. at 3). That account was opened as a consumer account (backed by equity in Plaintiffs' personal residence), reported as a consumer account by the bank, and always remained a consumer account according to the bank's CEO, Mr. Prisby, as well as according to Plaintiffs. (Exh. 3, Prisby Dep. at 57-62); (Exh. 1).

Defendant also concedes that Plaintiffs used the account to buy a car for their daughter and to put a roof on their home. (Def. Mem. at 3) (citing Def. Fct. Stmt. at ¶ 7). Although Mrs.

---

[5]     *Cobb v. Monarch Finance Corp.*, 913 F.Supp. 1164, 1174 (N.D. Ill. 1995) ("Under the TILA, like the EFTA, the term 'personal, family, or household purposes' distinguishes 'consumer' transactions from 'business' transactions") (*citing American Express Co. v. Koerner*, 452 U.S. 233, 242-43 (1981)).

[6]     *See Cole v. U.S. Capital*, 389 F.3d 719, 727 (7th Cir. 2004) (TILA is "remedial in nature, and the substance rather than the form of credit transactions should be examined in cases arising under it") (*citing and quoting Clark v. Rent-It-Corp.*, 685 F.2d 245, 248 (8th Cir. 1982)); *see also Ramadan v. The Chase Manhattan Corp.*, 156 F.3d 499, 502 (3d Cir. 1998) ("TILA is a remedial statute and should be construed liberally in favor of the consumer"); *Ellis v. Gen. Motors Acceptance Corp.*, 160 F.3d 703, 707 (11th Cir. 1998) (same) (*citing McGowan v. King, Inc.*, 569 F.2d 845, 848 (5th Cir .1978)).

Shames-Yeakel has run her accounting practice, Best Practices, out of *one room* in the house since 2005, it cannot accurately be said that the new roof was primarily a business transactions for the roof also covered Plaintiffs' bedrooms, kitchen, bathroom, and the other rooms of the residence, and Best Practices was not even in existence when the roof was repaired. (Exh. 1). Moreover, the bank is not making any claim or demand for money from Mrs. Shames-Yeakel's accounting practice. (Exh. 3, Prisby dep. at 61-62; Exh. 4, Stur dep. at 108). It is Plaintiffs' personal residence that the bank seeks to acquire via foreclose as payback for the loss. (Exh. 3, Prisby dep. at 61-62); (Exh. 4, Stur dep. at 108); (Exh. 17).

Thus, examining the transaction as a whole, it is evident that this is a consumer matter, and not a commercial one.

### 2. Defendant's Arguments That This Is Primarily A Commercial Transaction Fail

Defendant's arguments for why the home equity account and the transactions at issue here were primarily commercial matters are unavailing. First, Defendant argues that Plaintiffs used the home equity account for some non-consumer transactions, such as to finance cars that were partially used for their business and to finance a loft in Chicago. (Def. Mem. at 4-5). Although the cars were used partially for business, they were primarily used for personal and household purposes, such as going to the supermarket and to the homes of friends and relatives. (Exh. 1). Moreover, the car financing was *not* written off as a business expense, although mileage for specific business trips was deducted as a business expense. (Exh. 1). The loft in Chicago was simply not a business and not purchased or financed by Best Practices. It was purchased personally by Plaintiffs, and used personally by their son, who still lives in the loft. (Exh. 1). Mrs. Shames-Yeakel called the loft a personal investment in the sense that a 401k retirement account or a personal brokerage account that includes equities is an investment.

When their son no longer uses the loft, Plaintiffs would like to think that the property would sell for more than what they paid for it, like any good investment. (Exh. 1).[7] Overall, the use of the home equity account was for personal, family and household purposes.

Second, Defendant argues that the home equity account *became* "commercial" because it was "linked" to be viewed online together with Plaintiffs' other accounts, one of which was an account for Best Practices. (Def. Mem. at 5). Plaintiffs did have multiple accounts with the bank, but contrary to counsel's argument, the fact that they could view all of their accounts online on the same Citizens Bank Website (even if that Website was called "business online banking") did not transform the personal home equity account into a business account. This obvious reality was admitted by the bank's CEO. (Exh. 3, Prisby dep. at 99-103); (*see generally* Exh. 4, Stur. dep. at 101-05). The home equity account was a consumer account prior to the technological link that made it possible to view all of Plaintiffs' bank accounts together, and it remained a consumer account after that technological advent. (Exh. 3, Prisby dep. at 99-103).[8]

Third, Defendant argues that the home equity account was commercial because the Office of Thrift Supervision ("OTS") did not intervene following Plaintiffs' dispute and in fact agreed with the bank. (Def. Mem. at 3-4). That is because the bank misled the OTS into believing that the Plaintiffs' dispute was purely a "business" transaction. (Exh. 3, Prisby dep. at 57-60). This Court is not bound by the OTS's letters and can judge for itself whether the TILA,

---

[7]     In a related context, a non-commercial piece of real estate that functions as a personal "investment" for the buyer (such as a rental property) has been found to be consumer and not commercial. *See Thorns v. Sundance Properties*, 726 F.2d 1417, 1418-19 (9th Cir. 1984) (TILA meaning of "primarily for personal, family, or household purposes"); *Matise v. Trans Union Corp.*, Civ. No. 3:96-3353, 1998 WL 872511, at * 2 (N.D. Tx. Nov. 30, 1998) (FRCA meaning of "primarily for personal, family, or household purposes").

[8]     The link authorization that Plaintiffs signed is unlawful as discussed under the EFTA section, *infra*.

FCBA or any other consumer protection statute should be implicated here based upon a factual record before it, a record which was simply not available to the OTS.[9]

At its core, this is a consumer identity theft matter, and not a commercial loss case. It should thus be governed by the applicable consumer statutes, such as the TILA and FCBA. At a minimum, the record above establishes that there exist factual disagreements and genuine issues of material fact on this important point -- the consumer or commercial nature of the transaction. Accordingly, summary judgment should be denied, and Plaintiffs' TILA and FCBA claims should proceed to trial.

### B.    EFTA Covers The Unauthorized Funds Transfer At The Heart Of This Case

Plaintiffs also bring claims under the Electronic Funds Transfer Act, 15 U.S.C. §§ 1693 *et seq.* ("EFTA"), the federal statute intended to regulate "the use of electronic systems to transfer funds." *Id.* at § 1693(a) & (b). (*See* Amnd. Compl. at ¶¶ 41-43). Defendant argues that EFTA should not apply because the stolen money was electronically transferred to Hawaii via Mrs. Shames-Yeakel's business checking account for Best Practices, an account which was not established for "personal, family or household purposes." (Def. Mem. at 6-7). Thus, Defendant contends that EFTA has no place here because it is a consumer statute. (*Id.*)

To the contrary, this was a consumer loss, and Defendant knows that EFTA applies. As one federal court noted, the EFTA:

> was designed to create rights for consumers in an era in which banking could be conducted almost exclusively through machines. S.Rep. No. 915, 95th Cong., 2d Sess. at 3, reprinted in 1978 U.S. Code Cong. & Admin.News at 9273, 9405. The absence of personal contact was seen as a disadvantage in an automated system that is much more vulnerable to fraud, embezzlement and unauthorized use than traditional payment methods. *See Kashanchi v. Texas Commerce Medical Bank, N.A.*, 703 F.2d 936, 940 (5th

---

[9]     Notably, the OTS did not take Plaintiffs' case, did not hold any hearing, and did not make any ruling. Defendant does not argue that the OTS's letter has any binding or even persuasive effect upon this Court.

Cir. 1983), quoting H.R. Rep. No. 1315, 95th Cong., 2d Sess. 2 (1978). The Act was passed to alleviate this concern and "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic transfer systems." 15 U.S.C. § 1693. Accordingly, liability under the act is predicated on a finding that an electronic fund transfer has occurred. *Spain v. Union Trust*, 674 F.Supp. 1496, 1498 (D. Conn.1987).

In *Wachter v. Denver National Bank*, 751 F.Supp. 906, 908 (D. Colo. 1990). Here, there is no dispute that the fraudulent and unauthorized transaction, from start to finish, was automated, was conducted through an electronic terminal, and constitutes an electronic transfer under EFTA. *See* 12 C.F.R. § 205.2(h) & (m).

Although the Best Practices checking account was used as a pass-through in the transaction, the fraudulent $26,500 transfer was clearly *not* a business transaction. The bank's Rule 30(b)(6) witness as well as bank expert Tim Tedrick admit that the bank treated this transaction as one that was entitled to an investigation under EFTA. (Exh. 4, Stur dep. at 47-50); (*see also* Exh. 5, Tedrick dep. at 7-10, 22-23). In fact, the bank accepted and processed Plaintiffs' "electronic funds transfer" dispute. (Exh. 4, Stur dep. at 47-50). Now that Plaintiffs allege that the investigation was unreasonable and that the bank's demand for payment is improper (violating EFTA sections 1693f(a) & (b) as well as section 1693g), the bank argues that EFTA should not apply at all to this case because the transaction was purely business.

In an analogous setting, however, this District found that EFTA applies to a consumer transaction, examined as a whole, even though the particular accounts subject to certain electronic funds transfers may not have been typical consumer accounts. *See Cobb v. Monarch Finance Corp*., 913 F.Supp. 1164, 1174-75 (N.D. Ill. 1995). In *Cobb*, certain lenders created special bank accounts on a consumer's behalf exclusively for the purpose of receiving repayments of loans via the consumer's paycheck. *Id.* at 1164. Then, within the same banking

institution, the funds were transferred to finance company accounts. *Id.* The bank defendants in *Cobb* argued that EFTA should not apply because the accounts at issue were not established for "personal, family or household purposes." *Id.* at 1174-75. The court rejected that argument, however, because the transaction as a whole was a consumer transaction and the intermediary accounts served no business purpose for the consumer in that context. *Id.*

Similarly, in this case, examining the transaction as a whole, Plaintiffs' loss is a consumer loss, which threatens their greatest personal asset, their home. Indeed, the bank seeks to foreclose upon Plaintiffs' home, but admits that it has no claim against Best Practices. Although the home equity money went electronically through the Best Practices account, Best Practices had nothing to do with the transaction. It did not originate the transaction, authorize it, benefit from it, or even know about it. Moreover, the fraudulent transaction -- as opposed to other regular business transactions -- certainly had nothing to do with Mrs. Shames-Yeakel's accounting business.

Defendant's argument that this is a business transaction undermines EFTA, which has as its "primary objective" the "provision of individual consumer rights," not the interests of banks. *See* 15 U.S.C. § 1693(b).[10] If the EFTA is to be broadly construed in favor of consumers, as it was intended, the fact that the identity thief used intermediary business accounts (Best Practices and JV Financial) as a pass-through to steal consumer funds electronically should not be controlling.

---

[10] *See Burns v. First American Bank*, 04 C 7682, 2005 WL 1126904, at *5 (N.D. Ill. April 28, 2005) ("because EFTA's purpose is to promote disclosure, prevent fraud, and to allocate liabilities, it is evident that its primary objective, as stated in the statute, is the provision of individual consumer rights."); *see also Bank of America v. City and County of San Francisco*, 309 F.3d 551, 564 (9th Cir. 2002) ("The language of the EFTA indicates that the consumer protection measures contemplated by it are aimed at promoting disclosure, preventing fraud, and allocating liability").

Separately, Defendant violated EFTA at section 1693l by seeking a waiver of Plaintiffs' electronic fund transfer rights, in a form document that authorized the bank to "link" Plaintiffs' three "personal" accounts (including the home equity account) to Mrs. Shames-Yeakel's business checking account, and then seeking to enforce that waiver in its letter dated March 21, 2007, where the bank first advised Plaintiffs that they were responsible for the $26,500 loss. (Exh. 20) (March 21, 2007 letter); (*See also* Def. Mem. Attachment 4 to Stur Declaration) (link authorization).

Defendant does not even bother to argue to this Court that Plaintiffs waived their EFTA protections -- although that is the excuse that it gave to Plaintiffs on March 21, 2007. When Plaintiffs "linked" their four bank accounts online, the bank gave them an "Authorization for Linking and Access" form document to complete. (Def. Mem. Attachment 4 to Stur Declaration). The form document plainly identified three "personal accounts" and one business account.[11] Even though the bank knew that the "online link" would include "personal" accounts, it nevertheless inserted waiver language in the form stating that the bank would be "harmless" for "any action" related to online banking. (*Id.*).

The bank does not now seek to enforce that waiver because it knows that the EFTA provides that "[n]o writing or other agreement between a consumer and any other person may contain any provision which constitutes a waiver of any right conferred or cause of action created by this subchapter." 15 U.S.C. § 1693l. By seeking to disclaim all responsibilities under EFTA for online banking transactions and to be held harmless the bank clearly violated EFTA. (*See* Amnd. Compl. at ¶ 42(d)). Even the bank's expert, Tim Tedrick, admitted in his deposition that it is unlawful to seek a waiver of EFTA rights for consumer accounts. (Exh. 5, Tedrick dep.

---

[11]    The home equity account (# 5106****) was listed as a personal account. (Def. Mem. Attachment 4 to Stur Declaration).

at 33-34). There is, of course, no doubt that three of the four accounts on the Authorization for Linking and Access form are "personal" accounts.[12] Through its attempt to enforce an unlawful waiver, therefore, the bank separately violated EFTA at section 1693l.

In sum, Plaintiffs properly brought EFTA claims that should also proceed to trial.

### C. There Exist Genuine Issues Of Material Fact As To Whether Defendants Acted Unreasonably In "Investigating" Plaintiffs' Repeated Credit Disputes Under the FCRA

The bank did not keep the dispute concerning the fraudulent transfer just between it and Plaintiffs. Rather, it admits that it published the home equity account in derogatory status to the credit bureaus -- and through the bureaus to all of Plaintiffs' other creditors and potential creditors -- marring Plaintiffs' otherwise excelled credit record. Plaintiffs have thus also brought a claim under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 *et seq.* (*See* Amnd. Compl. at ¶¶ 44-47).[13] Interestingly, although this is another claim covering consumer transactions only (not business transactions), Defendant does not argue that the FCRA does not apply due to the "business" nature of this matter, like it does for Plaintiffs' TILA, FCBA and EFTA claims. Instead, Defendant argues that Plaintiffs have offered "no evidence" of any FCRA violation. (Def. Mem. at 7).[14] This argument also fails as Defendant continued to verify to the credit bureaus false

---

[12] Although the bank does not argue for waiver here, it nevertheless argues that Plaintiffs should be "estopped" from claiming that they are consumers because of the linking form. (*See* Def. Mem. at 5). There is no support for that argument, and the bank should receive no benefit or advantage by making Plaintiffs (and, no doubt, other consumers) sign an unlawful waiver. 15 U.S.C. § 1693l.

[13] Contrary to Defendant's suggestion at page 9 of its brief, the only FCRA claim that Plaintiff plead is one under section 1681s-2(b), which provides for a private right if action. (*See* Amnd. Compl. at ¶¶ 44-47); *see also Dornhecker v. Ameritech Corp.*, 99 F.Supp.2d 918, 928 (N.D. Ill. 2000).

[14] Defendant's FCRA challenge is on liability only, not damages. Therefore, in this response Plaintiffs focus only upon the argument actually raised by the bank. Plaintiffs note that they have pled and are requesting statutory damages of $100-$1,000, actual damages and punitive damages, as well as attorney's fees and costs. (*See* Amnd. Compl. at ¶¶ 44-47). Actual damages under the FCRA can be of a broad range and include harm to credit reputation, lost credit opportunities and emotional distress. Statutory damages under the FCRA, however, are recoverably even without any proof of actual damages. *See Murray v. GMAC Mortgage Corporation*, 434 F.3d 948,

information that could not be verified as true and accurate.

## 1.      The Reasonableness Of Defendant's "Investigations" Must Go To The Jury

The FCRA at section 1681s-2(b) provides that companies such as Defendant, which furnish data to the credit bureaus, must investigate any consumer dispute upon receiving notice of a dispute through a bureau.  The record shows that Defendant received at least 19 such disputes. (*See* Exh. 14).   Upon receipt of any such as dispute, the FCRA provides that a furnisher must:

> (A) conduct an investigation with respect to the disputed information;  . . . [and]
>
> (E) *if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified* after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly—
> > (i) modify that item of information;
> > (ii) delete that item of information; or
> > (iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b) (emphasis added).

Court have found that FCRA section 1681s-2(b) requires furnishers of credit data not to conduct a mechanical investigation into disputes, but a qualitatively reasonable investigation, as the circumstances warrant, in order to get to the bottom of the matter and accurately answer the dispute.  15 U.S.C. § 1681s-2(b)(1)(A).  *Johnson v. MBNA America Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004).[15]  If the disputed data cannot be verified, or is incomplete or inaccurate, the

---

953 (7th Cir. 2006) (where "actual loss is small and hard to quantify statutes such as the Fair Credit Reporting Act provide for modest [statutory] damages without proof of injury").

[15]      "The Seventh Circuit Court of Appeals appears to not have addressed the issue of what standard (a reasonableness standard or otherwise) for conducting investigations applies under Section 1681s-2(b)(1).  *See McKeown v. Sears Roebuck & Co*., 335 F.Supp.2d 917, 936 (W.D. Wis. 2004).  District courts within the Seventh Circuit, as well as courts within this district, however, have treated Section 1681s-2(b)(1) as implying a reasonableness requirement.  *See, e.g., Westra v. Trans Union LLC*, No. 03-1181, 2004 WL 1794482, at *1 (N.D. Ill. Aug.5, 2004) (Moran, J.); *McKeown [v. Sears, Roebuck& Co.]*, 335 F.Supp.2d [917], 936 (N.D. Wis.  2004) (collecting cases); *Buxton v. Equifax Credit Info., Servs. Inc.*, No. 02-6288, 2003 WL 22844245, at *2-*4 (N.D. Ill. Dec.1, 2003) (Holderman, J.) (conducting a reasonableness-of-investigation analysis); *Wade v. Equifax, Inc*., No.

furnisher has a duty to delete, modify or permanently block it from reporting. 15 U.S.C. § 1681s-2(b)(1)(E).[16]

Moreover, "precedent teaches that the reasonableness of an investigation under section 1681s-2(b) 'is generally a question of fact reserved for the jury.'" *Hinton v. USA Funds*, 03 C 2311, 2005 WL 730963 at *5 (N.D. Ill. March 30, 2005) (citing Seventh Circuit cases)*; see also Johnson v. MBNA, supra; Richardson v. Fleet Bank of Mass.*, 190 F. Supp.2d 81, 88 (D. Mass. 2001) (noting reasonableness of FCRA investigation is usually a question for a jury); *Sheffer v. Experian Info. Solutions, Inc.*, Civ. No. 02-7407, 2003 WL 21710573 (E.D. Pa. July 24, 2003) (same); *Evantash v. G.E. Capital Mortgage Servs., Inc.*, Civ. No. 02-1188, 2003 WL 22844198 *8 (E.D. Pa. Nov. 25, 2003) (same).[17]

In the case at bar, the reasonableness of Defendant's "investigations" is very much contested and presents a genuine issue of material fact for the jury. For example, a jury may properly find under the circumstances of this case that the bank failed to investigate at all, or had no basis to verify the home equity account as accurate, with a balance owing and a derogatory payment history.

The bank admits that it did not independently investigate the FCRA disputes, even though those disputes went to a different department than Plaintiffs' original "electronic funds

---

02-3205, 2003 WL 22089694, *2-*4 (N.D. Ill. Sept. 8, 2003) (Manning, J.) (same)." *Hinton v. USA Funds*, 03 C 2311, 2005 WL 730963 at *5 (N.D. Ill. March 30, 2005).

[16]    At a minimum, the furnisher must note that an item is disputed by the consumer, which may have a significant impact upon the consumer's credit score. *See Saunders v. Branch Banking & Trust Co.,* 526 F.3d 142, 146, 148-51 (4th Cir. 2008).

[17]    Even if a credit item is technically accurate, a furnisher still violates the FCRA if the way in which it reports that item is "misleading or materially incomplete." *Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37, 42 (D.C. Cir. 1984). A credit item may be considered inaccurate or incomplete for purposes of the FCRA if the way in which a furnisher reported it is misleading to potential creditors. *See Curtis v. Trans Union*, Nos. 02-C-207, 02-C-208, 2002 WL 31748838, at * 4 (N.D. Ill. Dec. 9, 2002) (finding that even factually correct information may be "inaccurate" for FCRA purposes where such information may be misleading to a party reviewing the consumer's credit report).

transfer" disputes, which were governed by a different compliance standard. The bank's Rule 30(b)(6) witness admitted under oath that the FCRA dispute agents (Judy and Annette) *did not* conduct any investigation on their own but rather simply copied the bank's computer "system response," which said that the account was accurate. (*See* Exh. 4, Stur dep. at 72-83, particularly at 78 and 82); *see Johnson*, 357 F.3d at 431) (bank must go beyond its own computer system notes in FCRA investigation, to investigate the accuracy of those notes).

Furthermore, a reasonable jury may find under these circumstances that the bank could not truly "verify" the accuracy of the data that it was reporting to the bureaus about the home equity account since the bank admits that: (1) Plaintiffs did not make or benefit from the $26,500 transaction; (2) Plaintiffs had nothing to do with the transaction or with JV Financial or Jared Allerbrand, who took the money; (3) Plaintiffs repeatedly disputed the transaction as a fraud and filed a police report; and (5) Fiserv had informed the bank of significant online security vulnerabilities during the month of the fraudulent transaction. Moreover the bank *knew* that the home equity account was a consumer account, which it was reporting to consumer credit bureaus. Nevertheless, it continued to "verify" data which it knew it could not verify, in violation of FCRA section 1681s-2(b)(1)(E).

At a minimum, a jury may reasonably find that the bank could not continue to report the home equity account as "accurate" since it admits that its investigations were "incomplete," and could not get to the bottom of the Plaintiffs' disputes. (Exh. 3, Prisby Dep. at 32-33); (Exh. 4, Stur dep. at 31-32) (investigation incomplete).

To the extent that the bank claims that the reporting was accurate because Plaintiffs authorized the transfer (*see* Answer at ¶ 10) (Exh. 3, Prisby dep. at 31-33); (Exh. 8, Milne dep. at

73-75), there clearly exist as genuine issue of material fact because the Plaintiffs vehemently deny such an accusation (*see* Exhs. 2, 10, 13, 14 and Def. Fct. Stmt. par. 34).

Defendant cites to *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005) which stands for the proposition that summary judgment may be appropriate in an FCRA case when the reasonableness of a furnisher's investigation procedures is "beyond question." (*Id.* at 827); (Def. Mem. at 7-8). There is simply no factual record in this case that even suggests that Defendant's procedures are reasonable, much less that their reasonableness is "beyond question." Moreover, *Westa* involved a situation distinguishable from the case at bar. In *Westa* a credit bureau provided the furnishers with an ambiguous dispute without ever mentioning identity theft or fraud, even thought that was what the consumer supposedly disputed. There is no ambiguity here, as all of the fair credit disputes clearly stated that Plaintiffs disputed the transaction as a fraud. (Exh. 4, Stur dep. at 79-80); (*see also* Exh. 14) (19 ACDV dispute forms).

In sum, Defendant cannot seriously argue on the factual record here that no reasonable jury could find that its "investigations" were lacking, unreasonable, incomplete, or ineffective under FCRA section 1681s-2(b). Accordingly, Defendant's Motion must also be denied as to Plaintiffs' FCRA claim.

### 2. Defendant Is Liable For Willful Violations Of The FCRA

Under the facts of this case, a reasonable jury may find not only that Defendant violated the FCRA, but also that it did so willfully.[18] The standard to show a "willful" violation under the FCRA is not high. As the U.S. Supreme Court recently confirmed, although a knowing violation of the act is willful, minimally a plaintiff need only show that the defendant acted recklessly in

---

[18] For a willful violation of the FCRA, a consumer may recover statutory damages of $100-$1,000 and punitive damages, in addition to actual damages and attorney's fees which can also be recovered for a negligent violation. *See* 15 U.S.C. §§ 1681n & o.

contravention of the statute or with "reckless disregard," not that it acted intentionally or with malice. *See Safeco Insurance Co. of America v. Burr,* 127 S. Ct. 2201, 2208-2210 (2007). This is a lower standard than the standard for willful violations or punitive damages claims under most common law torts.[19]

Here, the bank's CEO admits that the bank's actions were "knowing," "deliberate," and "intentional." (Exh. 3, Prisby dep. at 103-04). The bank's Rule 30(b)(6) witness agrees as to the intentionality of the bank's conduct and admits that the FCRA disputes were handled according to policy. (Exh. 4, Stur dep. at 82, 89-90). Surely, this is not a case of mere negligence. The bank is either willfully right or willfully wrong. *See generally Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 623 (7th Cir. 2007) (post-*Safeco* decision finding that plaintiff properly pled FCRA willfulness claim); *Gillespie v. Equifax Information Services, LLC*, 05 C 138, 2008 WL 4316950 at *5-8 (N.D. Ill. Sept. 15, 2008) (post-*Safeco* decision denying motion for summary judgment in FCRA willfulness case). Defendant makes no argument to the contrary.[20]

---

[19]    For a discussion of FCRA willfulness and the reckless disregard standard see generally *Cushman v. Trans Union Corp.*, 115 F. 3d 220, 227 (3d. Cir. 1997*); Stevenson v. TRW, Inc.*, 987 F.2d 288, 294 (5th Cir. 1993); *Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143, 151 (5th Cir. 1983).

[20]    Prior to *Safeco*, there were several decisions within the Seventh Circuit finding that for FCRA willfulness there must be a knowing violation of the law. Multiple federal courts that had applied the lower "reckless disregard" willfulness standard in FCRA dispute cases in other jurisdictions, however, have found that consumers may proceed to trial with their willfulness claims where a defendant's conduct is not merely a result of a negligent act that was promptly cured. *See, e.g., Sheffer v. Experian Info. Solutions, Inc.*, Civ. No. 02-7407, 2003 WL 21710573 at *3 (E.D. Pa. July 24, 2003) (defendant's conduct was willful, and not merely an "isolated instance of human error . . . promptly cure[d]") (*quoting Boris v. Choicepoint Servs.*, 249 F. Supp.2d 851, 862 (W.D. Ky. 2003)) (emphasis added); *see also Saunders v. Branch Banking & Trust Co.,* 526 F.3d 142, 151 (4th Cir. 2008) (jury issue presented as to defendant furnisher's FCRA willfulness in investigating consumer disputes and marking disputed account as "disputed"); *Apodaca v. Discover Fin. Servs. et al.*, 417 F.Supp. 2d 1220 (D.N.M. 2006) (denying defendant's motion for partial summary judgment and permitting consumer to proceed to trial with willfulness claim stemming from improper investigation procedures*); Sampson v. Equifax Info. Servs. LLC*, Civ. No. 204-187 (S.D. Ga. Aug. 29, 2005) (denying defendant's motion for summary judgment and permitting consumer to proceed to trial with willfulness claim stemming from improper investigation procedures)*; DiPrinzio v. MBNA America Bank, NA*, Civ. No. 04-872, 2004 WL 2039175 (E.D. Pa. Aug. 24, 2005) (furnisher claim for willful FCRA violation may proceed to jury).

There can be no doubt that the bank in this case made conscious and knowing decisions that show a high degree of recklessness and indifference for consumer rights that is well beyond negligence. The conduct and violations of FCRA section 1681s-2(b) set forth in the previous section are of such a nature that they provide more than sufficient evidence on which a jury may reasonably make a "reckless disregard" finding. Accordingly, Defendant's Motion should also be denied as to Plaintiffs' willfulness claims under FCRA section 1681n.

### D.   There Exist Genuine Issues Of Material Fact As To Plaintiffs' Negligence Claim

Finally, Defendant argues that Plaintiffs cannot even pursue a negligence claim. (Def. Mem. at 11). Specifically, Defendant contends that it breached no duty (consumer, commercial or otherwise) and that Plaintiffs can show no causal link between a beach of duty and any damages. (*Id.*). This argument also fails.

Defendant can obviously be negligent by violating statutory duties. *French v. Bristol Myers Co.*, 574 N.E.2d 940, 943 (Ind. Ct. App. 1991) (violation of a statutory duty alone necessarily constituted some degree of negligence under Indiana law); *Thiele v. Norfolk & Western Ry. Co.*, 68 F.3d 179, 184-85 (7th Cir. 1995) (same).[21]   Since Defendant has multiple duties under EFTA, TILA, FCBA, and the FCRA, Plaintiffs may proceed with a negligence claim by a showing that there exists a genuine issue of material fact as to Defendant's beach of any such statutory duty.

Even if Defendant's argument that this is primarily a commercial matter is correct (which it is not), there is still no doubt that Defendant assumed the duties of conducting fair credit billing, fair credit reporting and electronic find transfer investigations. *Holtz v. J.J.B. Hilliard W.L. Lyons, Inc.*, 185 F.3d 732, 740 (7th Cir. 1999) (Under Indiana law, a duty of care may be created in one of three ways -- by statute, at common law, or *by assuming the duty*) (emphasis added)

---

[21]     Defendant agrees that Indiana law would apply to Plaintiffs' negligence claim. (*See* Def. Mem. at 12).

(citing cases). Here, Plaintiffs have come forward with substantial evidence that Defendant failed

to abide by multiple statutory duties as evidenced by the following conduct:

- advising Plaintiffs that they were responsible to pay the full amount of the unauthorized and fraudulent transfers from their accounts and billing them for the same, in violation of 15 U.S.C. § 1643; (*See* Exhs. 20, 17, 18 ; Prisby Dep. (Exh. 3) at 61-62; Stur Dep. (Exh. 4) at 89-90).

- demanding that Plaintiffs make payments for the interest on the full amount of the unauthorized and fraudulent transfers from their accounts in violation of 12 C.F.R. § 226(d)(1); (*See* Exhs. 20, 17, 18; Prisby Dep. (Exh. 3) at 61-62; Stur Dep. (Exh. 4) at 89-90).

- attempting to collect from Plaintiffs any portion, or interest thereon, of the funds that were fraudulently transferred from Plaintiffs' accounts violation of 12 C.F.R. § 226(d)(1); (*See* Exhs. 20, 17, 18; Prisby Dep. (Exh. 3) at 61-62; Stur Dep. (Exh. 4) at 89-90).

- failing to reasonably investigate and correct the unauthorized and fraudulent transfers from Plaintiffs' account in violation of 15 U.S.C. § 1666; (*See* Exhs. 20, 17, 18; Prisby Dep. (Exh. 3) at 32-33, 61-62; Stur Dep. (Exh. 4) at 30-33, 72-82 89-90).

- reporting Plaintiffs to the credit reporting agencies as owing money and being delinquent in their payments on their home equity line of credit account when Defendant knew that the transfer was unauthorized and fraudulent and that Plaintiffs had disputed the balance, in violation of 15 U.S.C. § 1666a and 12 C.F.R. § 226.13(d)(2); (*See* Exhs. 20, 17, 18, 15; Prisby Dep. (Exh. 3) at 32-33, 61-62; Stur Dep. (Exh. 4) at 30-33, 72-82 89-90).

- continuing to report Plaintiffs as owing money and being delinquent in their payments on their home equity line account after Plaintiffs additionally disputed the inaccurate information with the credit reporting agencies when Defendant knew that the transfer was unauthorized and fraudulent and that Plaintiffs had disputed the balance, in violation of 15 U.S.C. § 1666a; (*See* Exhs. 20, 17, 18, 15; Prisby Dep. (Exh. 3) at 32-33, 61-62; Stur Dep. (Exh. 4) at 30-33, 72-82 89-90).

- failing to perform a good faith investigation into the Plaintiffs' electronic funds transfer disputes and provide Plaintiffs with the results of the investigation within ten business days, in violation of 15 U.S.C. § 1693f(a); (*See* Exhs. 20, 17, 18, 15; Prisby Dep. (Exh. 3) at 32-33, 61-62; Stur Dep. (Exh. 4) at 30-33, 72-82 89-90). (*see also* Exh. 5, Tedrick dep. at 7-10, 20-23).

- failing to correct the error created by the unauthorized electronic transfer from Plaintiffs' account, in violation of 15 U.S.C. § 1693f(b); (*See* Exhs. 20, 17, 18, 15;

Prisby Dep. (Exh. 3) at 32-33, 61-62; Stur Dep. (Exh. 4) at 30-33, 72-82 89-90). (*see also* Exh. 5, Tedrick dep. at 7-10, 20-23).

- demanding that Plaintiffs pay the entire amount of the unauthorized electronic fund transfer, in violation of 15 U.S.C. § 1693g; (*See* Exhs. 20, 17, 18, 15; Prisby Dep. (Exh. 3) at 32-33, 61-62; Stur Dep. (Exh. 4) at 30-33, 72-82 89-90). (*see also* Exh. 5, Tedrick dep. at 7-10, 20-23).

- demanding that Plaintiffs waive their rights under EFTA, in violation of 15 U.S.C. § 1693l; (*See* Def. Mem. Stur decl. at attachment 4); (*see also* Exh. 5, Tedrick dep. at 34-35).

- failing to conduct an investigation of the inaccurate credit information that Plaintiffs disputed, in violation of 15 U.S.C. § 1681s-2(b); (*See* Exhs. 20, 17, 18, 15; Prisby Dep. (Exh. 3) at 32-33, 61-62; Stur Dep. (Exh. 4) at 30-33, 72-82 89-90). (*see also* Exh. 5, Tedrick dep. at 7-10, 20-23).

- negligently continuing to furnish and disseminate inaccurate and derogatory credit, account, and other information concerning the Plaintiffs to credit reporting agencies and other entities after the investigations, in violation of 15 U.S.C. § 1681s-2(b). (*See* Exhs. 20, 17, 18, 15; Prisby Dep. (Exh. 3) at 32-33, 61-62; Stur Dep. (Exh. 4) at 30-33, 72-82 89-90); (*see also* Exh. 5, Tedrick dep. at 7-10, 20-23).

Defendant also breached its duty to protect Plaintiffs' online banking account information by permitting the online transfer in the first place. Defendant's own expert, Mark Scholl, admits that the banking industry recognizes certain security standards and duties for online banking including the guidelines of the Federal Financial Institutions Examination Counsel ("FFIEC"). *See generally* http://www.ffiec.gov. Here Defendant failed to provide Plaintiffs with a "token" to enhance their online banking security or to implement any "multifactor authentication" measures, despite the fact the FFIEC directed that such security measures be put in place prior to the end of 2006. (Exh. 6, Scholl dep. at 35-41) (Exh. 8, Milne dep. at 87-90). The FFIEC states that Electronic versions of the Information Security Booklet and Executive Summary are available at www.ffiec.gov/guides.htm; http://www.ffiec.gov/pdf/authentication_guidance.pdf;

http://www.fdic.gov/news/news/financial/2005/fil10305.html).  In this respect Defendant also breach common law duties of care.  *See Holtz* 185 F.3d 732.

Moreover, there can be no serious argument that Defendant's conduct in allowing the online fraud and then holding Plaintiffs responsible for it is the cause of Plaintiffs' economic, credit and emotional distress damages.  There is no other cause, than the bank's conduct, for Plaintiffs' lost money, ruined credit, and fear that they will be foreclosed upon and thrown out of their house.  Accordingly, Plaintiffs' negligence claim should also survive summary judgment.

## IV.    CONCLUSION

For all of the reasons set forth above, Defendant's Motion for Summary Judgment should be denied.

**FRANCIS & MAILMAN, P.C.**


  _/s/ John Soumilas_____
JOHN SOUMILAS
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA 19110
Phone: (215) 735-8600
Fax: (215) 940-8000
E-mail: jsoumilas@consumerlawfirm.com

**LARRY P. SMITH & ASSOCIATES, LTD.**
LARRY P. SMITH
205 N. Michigan Ave., Suite 4000
Chicago, IL 60601
Phone: (312) 222-9028
Fax:    (312) 602-3911
E-mail:  lsmith@lpsmithlaw.com

DATE:  October 21, 2008            *Attorneys for Plaintiffs*